1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                         NORFOLK DIVISION


 3


 4  UNITED STATES OF AMERICA,      )
                                   )
 5              Plaintiff,         )
                                   )
 6  v.                             )     Criminal Action No.:
                                   )          2:17cr126
 7  DARYL G. BANK,                 )
                                   )
 8              Defendant.         )


 9


10                    TRANSCRIPT OF PROCEEDINGS

11                       (Motions Hearing)


12
                         Norfolk, Virginia
13                        March 22, 2018

14  BEFORE:       THE HONORABLE MARK S. DAVIS
                  United States District Judge
15


16


17  Appearances:

18          OFFICE OF THE UNITED STATES ATTORNEY
                    By: MELISSA O'BOYLE
19                      ELIZABETH YUSI
                        KEVIN HUDSON
20                      Counsel for the United States

21          ZOBY & BROCCOLETTI
                    By: JAMES O. BROCCOLETTI
22          - and -
            LAW OFFICE OF JASON M. WANDNER
23                  By: JASON M. WANDNER
                        Counsel for Defendant

24


25          The Defendant appearing in person.
```

1                          P R O C E E D I N G S

2

3              (Proceedings commenced at 11:34 a.m. as follows:)

4

5              COURTROOM DEPUTY CLERK:  In Case No. 2:17cr126, the

6    United States of America v. Daryl G. Bank.

7              Ms. O'Boyle, is the government ready to proceed?

8              MS. O'BOYLE:  The United States is ready.  Good

9    morning, Your Honor.

10              THE COURT:  Good morning, Ms. O'Boyle.  You have with

11    you Mr. Hudson and Ms. Yusi?

12              MS. O'BOYLE:  Yes.

13              MR. HUDSON:  Yes, sir, good morning.

14              COURTROOM DEPUTY CLERK:  Mr. Broccoletti, is the

15    defendant ready to proceed?

16              MR. BROCCOLETTI:  Good morning, Your Honor, present

17    and ready.  And may I introduce Mr. Jason Wandner from Florida

18    who has been admitted *pro hac vice* to appear as co-counsel in

19    this case.

20              THE COURT:  All right.  Good to have you, Mr. Wandner.

21              MR. WANDNER:  Thank you, Judge.

22              THE COURT:  All right.  Well, we're here today for a

23    hearing regarding Mr. Bank's pending motion for return of

24    property and the first motion *in limine* also concerning victim

25    impact evidence, as least as I understand what we've been, I've

1    asked you to prepare for.

2         I'm going to first hear argument on the motion for

3    return of property, and then I'll hear argument on the motion *in*

4    *limine*, and then of course we also have the motion to

5    reconsider.  So if time permits, I'll hear argument regarding

6    Mr. Bank's motion to reconsider and motion to modify bond to

7    permit sale of the family home, and I think Ms. Yusi may have

8    written that.

9         MS. O'BOYLE:  Your Honor, we were under the impression

10   that the Court had referred those to Judge Leonard.  We

11   certainly will argue them if the Court would like to hear those

12   today, but we did not prepare to present evidence relatable to

13   those issues today.

14        THE COURT:  Okay.  Well, Madam Clerk, while I'm moving

15   on.  Will you determine whether they have been referred?

16        COURTROOM DEPUTY CLERK:  Yes, sir.

17        THE COURT:  Okay.  Thank you.

18        So once I started getting into the issue of the

19   pending motion for return of property, which was challenging,

20   because I've been in this RICO murder trial for seven weeks, but

21   once I started, you know, delving into it, a lot of questions

22   arose, and so I'm going to try to sort of tell you where I think

23   we are, or I am, and then give you the opportunity to comment on

24   some of the issues that are outstanding.

25        So at the outset I note that the Court is of the view

 1    that in the absence of the filing of a timely claim contesting

 2    the administrative forfeiture, the Court lacks jurisdiction to

 3    adjudicate the merits of the forfeiture, as our Court of Appeals

 4    observed in the Ibarra v. United States case in 1997.  And where

 5    no valid claim has been timely filed, district courts, at least

 6    as I understand it, only retain limited jurisdiction to

 7    determine whether the seizing agency complied with the notice

 8    and other procedural requirements, as our Court of Appeals said

 9    in U.S. v. Minor in 2000.  I understand the defendant to be

10    arguing that the Supreme Court's Lewis decision in 2016 has

11    somehow altered the procedural requirements for an

12    administrative forfeiture, and consequently that this court

13    retains limited jurisdiction to determine whether the

14    administrative forfeiture complies with these new alleged

15    procedural requirements.  And so I'm primarily interested in

16    determining what the status of the administrative forfeiture

17    currently is, and then second, what defendant's precise argument

18    is regarding how Lewis changed the procedural requirements for

19    forfeitures.

20            Now, I have a series of questions, and I've thought

21    about how I should handle this, and I think maybe it would be

22    best to just get right to the questions before, because there's

23    already been briefing on these issues, rather than just letting

24    you all launch in some general kind of arguments.  So who is

25    going to be handling this for Mr. Bank?

```
 1              MR. WANDNER:  Jason Wandner, Judge.

 2              THE COURT:  All right.  Come on up to the podium if

 3  you would, Mr. Wandner.

 4              So the Court's understanding is that you have not

 5  filed a timely claim contesting the administrative forfeiture.

 6  Is that right?

 7              MR. WANDNER:  That's actually not correct, Judge.  We

 8  did file a timely claim.  We sent --

 9              THE COURT:  When was that?

10              MR. WANDNER:  Within the prescribed time period in the

11  notices.  Mr. Broccoletti filed one on behalf of the defendant,

12  and we filed one on behalf of Katrina Bank, his wife.  Both were

13  sent timely and set forth specifically the demand and claim on

14  behalf of the cash proceeds that we are litigating today.

15              THE COURT:  Okay.  And.

16              MR. WANDNER:  And we have copies of those, Judge.

17              THE COURT:  You're conceding obviously, I would take

18  it then, that the government met its notice requirements?

19              MR. WANDNER:  Judge, they certainly put both parties

20  on notice, and we have complied with it.  And if the Court needs

21  copies of those, I'm sure we can file those by the end of today.

22              THE COURT:  So, and before I forget, the motion to

23  reconsider was referred to Judge Leonard, but it was referred

24  back to us.  But I won't make you all argue that today, since

25  you're not prepared, apparently.
```

1          (Court and courtroom deputy conferred.)

2          THE COURT:  It's not formally reflected on the docket

3    that was it was referred back, according to the clerk.

4          All right.  So once -- so an administrative claim was

5    filed, and once that has happened, what transpired regarding

6    those claims at this point?  Where are we procedurally?

7          MR. WANDNER:  My understanding, Judge, is once the

8    claimant or claimants in this case filed their claim, it is up

9    to the government to then proceed with filing an actual

10   complaint to -- which would start a litigation process, which

11   has not, as far as we understand it, has not yet been started.

12   We have not seen any kind of actual claim made.  But that would

13   be the, as far as I understand the law, there would be some sort

14   of a separate claim, and also in federal court, but outside of

15   the criminal case.

16         THE COURT:  I think I'd better hear from Mr. Hudson,

17   Mr. Wandner.

18         MR. WANDNER:  Okay.

19         THE COURT:  Thank you.  You can go ahead and have a

20   seat.

21         MR. HUDSON:  Okay.  So --

22         THE COURT:  I guess I'm a little confused.  I don't

23   know how I missed -- was it in the pleading that the claim had

24   been filed?

25         MR. HUDSON:  So at the time that I filed my response,

1    I don't think a claim had a been filed.  But I can confirm for

2    the Court that indeed a claim has now been filed.

3            THE COURT:  Was it timely?

4            MR. HUDSON:  I believe it was timely, because FBI

5    referred it, referred it to us, referred it to our office.  And

6    so what --

7            THE COURT:  So you're supposed to file a complaint at

8    that point, right?

9            MR. HUDSON:  Not necessarily.  That is one of three

10   options.  So under 18 U.S.C. 983(a)(3)(A), says "Not later than

11   90 days after a claim has been filed" the government essentially

12   has one of three options.  It can, (i), give the property back,

13   (ii), initiate a civil forfeiture action, or (iii), include the

14   property in a criminal forfeiture proceeding; that is to say,

15   either file a Notice of Particulars saying that the property in

16   question is included within the forfeiture allegation in the

17   indictment, or in the alternative, seek a superseding indictment

18   which names the property in the indictment.  In this case we

19   already have a forfeiture allegation in the indictment.  The

20   indictment is, as the Court is aware --

21           THE COURT:  Hold on.  Hold on.

22           MR. HUDSON:  Yes, sir.

23           THE COURT:  983.

24           MR. HUDSON:  Yes, sir.

25           THE COURT:  (a).

```
1              MR. HUDSON:  (a).  It starts at (3)(A), which in

2    the --

3              THE COURT:  (a)(1) or (a) --

4              MR. HUDSON:  (a)(3)(A), Your Honor.

5              THE COURT:  Hold on.

6              MR. HUDSON:  Yes, sir.

7              THE COURT:  I have to be tracking with you.

8              MR. HUDSON:  Yes, sir.  Of course.

9              THE COURT:  All right.  So this has so many subparts.

10             MR. HUDSON:  I know, Your Honor.  It's not exactly the

11   easiest statute to look at in the world, and it goes on for a

12   couple pages.

13             So --

14             THE COURT:  Hold on.  I'm not there yet.

15             MR. HUDSON:  Yes, sir.  I'm sorry.

16             THE COURT:  Are we using the same book?

17             MR. HUDSON:  The Court has the blue one.  I've got the

18   green one.

19             THE COURT:  Okay.  Hold on.

20             MR. HUDSON:  Oh, Ms. O'Boyle has the blue one.

21             THE COURT:  My green one has disappeared.

22             MR. HUDSON:  Your Honor, if the Court would give me a

23   moment of indulgence, they did show where 983 is.  So I'm

24   looking on not the page where 983 begins, I guess that's

25   Page 661.  Page 662.
```

1           THE COURT:  Okay.

2           MR. HUDSON:  Over on the right column about halfway

3    down is where it starts.

4           THE COURT:  (3)(A).

5           MR. HUDSON:  (3)(A).  It actually goes into (B) as

6    well because (B) talks about what happens if the government

7    doesn't do one of these things before the 90 days.

8           THE COURT:  And the three options are all in (A)?

9           MR. HUDSON:  (A) only sets out the civil option.  (B)

10   also sets forth the criminal option.

11          THE COURT:  So (A) is civil, (B) is the criminal

12   option?

13          MR. HUDSON:  Criminal, yes, sir.

14          THE COURT:  Okay.  So under (A), "Government shall

15   file a complaint for forfeiture in the manner set forth in the

16   supplemental rules for certain admiralty and maritime claims, or

17   return the property pending the filing of a complaint, except

18   that a court in the district to which the complaint may be filed

19   may extend the period for filing a complaint for good cause

20   shown or upon agreement of parties."

21          (B).  If the government does not file a complaint for

22   forfeiture or return the property in accordance with

23   subparagraph (A), or before the time for filing a complaint has

24   expired, obtain a criminal indictment containing an allegation

25   that property is subject to forfeiture and takes step necessary

```
 1   to preserve its right to maintain custody of the property as

 2   provided in the criminal forfeiture statute, the government

 3   shall promptly release the property.

 4          You're contending you're proceeding under which one?

 5          MR. HUDSON:  We're proceeding under the criminal one,

 6   Your Honor, under (B).

 7          I can also let the Court know, I should have said this

 8   earlier, (C), just beneath (B), provides that "In lieu of or in

 9   addition to filing a civil forfeiture complaint, the government

10   may include a forfeiture allegation in a criminal indictment."

11   Now certainly we've done that.  We've done that right at this

12   point.  And in terms of at least going to subpart (B), that

13   would involve either obtaining a superseding indictment or

14   filing a notice of particulars stating that the property is

15   included in the forfeiture allegation in the indictment.

16          THE COURT:  Okay.  So your view of what we're doing is

17   proceeding under 3(B) --

18          MR. HUDSON:  And (C), yes, sir.

19          THE COURT:  -- (i)...

20          MR. HUDSON:  (3)(B)(ii)(I), yes, sir.

21          THE COURT:  (3(B(i) or lower case (ii).

22          MR. HUDSON:  Two -- yeah, lower case (ii), excuse me

23   sir.  Lower case (ii) and then capital I or capital Roman

24   numeral I.

25          THE COURT:  Then under (C)...
```

1           MR. HUDSON:  Yes, sir.

2           THE COURT:  We're proceeding under C in your view?

3           MR. HUDSON:  Yes, sir.

4           THE COURT:  Okay.

5           MR. HUDSON:  And so in that instance, Your Honor,

6    whether the defendant has the right to the return of the

7    property pretrial is governed by United States v. Farmer and the

8    cases flowing from United States v. Farmer.  And so --

9           THE COURT:  And you view what the defendant has done

10   is essentially filing a Monsanto or Farmer request?

11          MR. HUDSON:  Yes, sir, that's right.  But without

12   actually mentioning either of those cases.  And so I don't know

13   how much the Court wants to hear from me on this particular

14   point, but I would submit to the Court they haven't even made

15   the threshold showings they need to make under Farmer, the

16   Farmer line of cases that would entitle them to any kind of

17   relief that would entitle them to have the government put on any

18   kind of evidence.  They filed just the two-page motion.  I can

19   go into more detail if the Court would like.

20          THE COURT:  Well, yeah, I think you should.

21          MR. HUDSON:  Yes, sir.  Of course.  So I'll let the

22   Court know we are prepared to put on evidence today, but that

23   doesn't change the fact that Farmer is a two-step process with a

24   shifting burden of proof, as the government set out in its

25   response brief on this motion.

 1        Now, the defense has filed a two-page motion, as I

 2   mentioned.  It doesn't even mention Farmer.  And it's a motion

 3   that makes no serious attempt to satisfy either of Farmer's

 4   threshold requirements.  As the Court is aware, the threshold

 5   requirements under Farmer are twofold:  No. 1, that the

 6   defendant lacks other funds with which to retain counsel of

 7   choice, and two, that probable cause is lacking; that the asset

 8   in question here, the $77,000, would be subject to forfeiture.

 9   Those are the threshold requirements on which the defendant has

10   the burden before the government has any further burden.  And I

11   say further burden because the government has already made a

12   probable cause showing, actually two of them, before we have

13   even gotten to this point.

14        THE COURT:  So is it your view that there was a

15   probable cause showing that was made in the warrant that was

16   issued in Florida that didn't identify particular funds, but

17   just covered the seizure, search and seizure warrant covered

18   money?  So is it your view that's one?

19        MR. HUDSON:  That is one of the two, Your Honor.

20        THE COURT:  And is the second one the issuance here

21   specifically by the magistrate judge?

22        MR. HUDSON:  That's correct, Your Honor.  So we have

23   gotten two magistrate judges to pass on this issue:  One before

24   the seizure occurred, and of course factually it would have been

25   impossible for the government to get a seizure warrant for this

1   cash prior to executing the search warrant, it's just the nature

2   of the fact scenario that we have here.  There may be an idea

3   that there may be some cash in the house, but it would be, it

4   would be a rarity that agents would know prior to executing a

5   search warrant precisely how much cash they're going to find in

6   a house.  Therefore, I would submit to the Court that the

7   affidavit and the warrant that issued in the Southern District

8   of Florida got as specific as it could possibly get.  And again,

9   after the, after the seizure occurred, we got a second opinion

10  from Judge Leonard here in the Eastern District of Virginia, and

11  he also issued a seizure warrant.  So...

12          THE COURT:  Where he found probable cause.

13          MR. HUDSON:  Correct, sir.

14          THE COURT:  Based on specific evidence presented to

15  him, he found that there was probable cause that the $77,000 and

16  change was the result of criminal activity --

17          MR. HUDSON:  Yes, sir.

18          THE COURT:  -- by the defendant?

19          MR. HUDSON:  Correct, sir.  Yes.

20          THE COURT:  And so did you get that second warrant

21  because you thought you needed to or out of an abundance of

22  caution --

23          MR. HUDSON:  The latter.

24          THE COURT:  -- what's your view?

25          MR. HUDSON:  The latter, Your Honor.  Especially in

1   light of the filing of the motion on the $77,000 it was out of

2   an abundance of caution that we got a second opinion.  I don't

3   think we would need to, because the, as I explained a moment

4   ago, the warrant that issued in the Southern District of Florida

5   got as specific as it possibly could based on what was known at

6   the time.  I mean, Item No. 1 in the Attachment B to the search

7   warrant was cash found at the address.  And so they were

8   authorized to seize the cash found at the address.  And I think

9   the reasons offered in the warrant were, one, fruits of the

10  crime, and two, evidence of the crime.  And the magistrate judge

11  in the Southern District of Florida found probable cause to that

12  effect.  The affidavit that was attached as an exhibit to the

13  government's response brief goes into a good deal of detail

14  about the financial investigation in the case, at least based on

15  the records we had to that point.  And it also, I would submit,

16  demonstrated that the fraud was continuing.  It discussed the

17  Oculina Bank study that went into 2017.  It certainly showed

18  that the fraud was continuing, and it demonstrated that the

19  lion's share of the defendant's money was coming from this fraud

20  scheme.  And --

21          THE COURT:  So you know, you've --

22          MR. HUDSON:  Yes, sir.

23          THE COURT:  This is what you do, mostly, I think, in

24  our district is what you handle, and it's a somewhat, I think

25  you could say an arcane area of the law that we're not dealing

1   with every day.  You know, I can't very -- in nine-plus years, I

2   don't know, I've had a couple of these issues come up like this.

3   I'm going to probe a lot.

4           MR. HUDSON:  Yes, sir that's fine.

5           THE COURT:  The defendant essentially has argued that

6   in 2016 the Supreme Court changed the landscape in that there

7   was concern about, at that time, the government seizing

8   untainted assets pretrial, essentially coming in and freezing

9   money when no trial had taken place, all you had was the charge,

10  the accusation, the indictment, seizing money, and essentially

11  keeping a defendant from being able to use that money to hire

12  his own attorney, as he had a Sixth Amendment right to do.  And

13  the Luis case dealt with a different statute than what we are

14  dealing with here, but in a, I guess that was a plurality, was

15  it a plurality opinion?  It was a close opinion nonetheless, the

16  Court said you can't, you cannot seize untainted funds.  And

17  again, I don't claim to be any expert on this at this point, and

18  you all are helping me work through this, but two of the

19  justices, Justice Breyer and Justice Alito, were concerned that

20  in their concurrence I think they were concerned that money is

21  tangible -- is fungible, excuse me, is fungible, so it's hard to

22  distinguish in some circumstances between tainted and untainted.

23  And what do you understand the defendant's argument -- although

24  that was a different statute, what do you understand the

25  defendant's argument to be here under the statutes we're dealing

```
 1  with?

 2          MR. HUDSON:  I understand the defendant's arguments to

 3  be twofold.  First, best as I can gather from the motion that

 4  was filed, there seems to be a suggestion in there, though it is

 5  not explicitly stated, that somehow Luis and Chamberlain, a

 6  Fourth Circuit case that came out just very recently this year,

 7  somehow overruled the Farmer line of cases.  I also take them --

 8          THE COURT:  Can you stay right up there at the podium

 9  for me, because we have a new system and the microphone is up

10  there in front of you.  Thank you.

11          MR. HUDSON:  Yes, sir.

12          UNIDENTIFIED SPEAKER:  Can't hear back here either.

13          THE COURT:  Okay.  We have many people in the gallery,

14  and it sounds like they're having trouble hearing you too.  The

15  acoustics in the courtroom aren't the best, perhaps.  But if

16  you'll stay right there, we'll see.

17          MR. HUDSON:  Of course, sir.

18          And so that is the first argument that, at least best

19  as I can gather, they are making that somehow Luis and

20  Chamberlain, the Fourth Circuit case that came out earlier this

21  year, somehow overruled the Farmer line of cases.  That's part

22  one.

23          Part two I take them to be saying --

24          THE COURT:  Overruled it.  Let's deal with that while

25  it's --
```

1          MR. HUDSON:  Yes, sir, of course.

2          THE COURT:  Overruled it how?

3          MR. HUDSON:  I suppose overruled the threshold

4    requirements that they have to meet in order to, one get a

5    hearing in the first place, and two, to get the government to

6    present any further evidence aside from the affidavits it has

7    already submitted to two magistrate judges.

8          THE COURT:  That's interesting.  So how -- the two

9    requirements in order to cause a court to have a hearing on the

10   seizure are that the defendant show he lacks funds to retain

11   counsel and that the government lacks probable cause to seize

12   the property --

13         MR. HUDSON:  Yes, sir, that's correct.

14         THE COURT:  -- right?  And you think that they may be

15   arguing that Luis and Chamberlain somehow modified those

16   requirements.  What do you understand their argument to be as to

17   why or how it modified it?

18         MR. HUDSON:  Well, again, as best as I can gather from

19   the two-page motion that was filed, I take them to be saying

20   that they don't need to mention Farmer, don't need to satisfy

21   Farmer, all they have to do -- essentially I take them to be

22   saying they have an automatic right to a hearing on this

23   question.  And Farmer does not say that.  But I mean, I

24   certainly -- if that is what they're saying, I have -- I most

25   certainly have something to say to that.

1        And there's a second component to what I think they're

2   saying as well.  I don't know if the Court wants me to go into

3   that or stick with this first point.

4        THE COURT:  No, I think you can go on.

5        MR. HUDSON:  Yes, sir.  So the second point that it

6   appears they're making is that because cash is fungible and you

7   can't trace cash, essentially -- I know they might be saying you

8   can't seize cash in this case, but I don't know how you could

9   distinguish this from any other case -- I mean, it essentially

10  seems they're saying you can't seize cash, you just can't seize

11  cash because, you know, 99 percent of the time you're not going

12  to be able to trace cash because cash is a fungible thing.  Cash

13  does not leave an electronic or paper trail in the same way that

14  bank accounts do.  I have something to say to that too.

15       THE COURT:  Okay.

16       MR. HUDSON:  Would the Court like me to respond to

17  that point?

18       THE COURT:  Yes.

19       MR. HUDSON:  All right.  So Your Honor, the affidavits

20  in support of the search warrant, or the one search warrant, the

21  seizure warrant that was issued in this case, both show that the

22  vast majority of the defendant's money, at least from 2012 to

23  2015, came from the fraudulent activity in the indictment.  And

24  the affidavits also demonstrated that the fraud continued into

25  2017, 2017 being the time when the cash was seized.  We have --

```
1    now, this portion is not included in the affidavits, but we have
2    since gotten financial records from 2016 and 2017, and I can
3    tell the Court they show nothing different.  But where we know
4    that the majority of someone's money is coming from unlawful
5    activity, and the bar is as low as probable cause, and the
6    Supreme Court has acknowledged in this very context in the Kaley
7    case that from 2014 that probable cause is a fairly low bar.
8    And so where we know the vast majority of money's coming from an
9    unlawful activity, here fraud, then going right up to the time
10   of the seizure, then it stands to reason -- I mean, at least to
11   a probable cause standard, that cash seized would constitute
12   proceeds of that unlawful activity.
13          To give maybe a more common example, no, I don't think
14   anyone questions for a moment when we know that someone's been
15   selling drugs for the last couple years and the police go into
16   the person's house and there's cash there in the house, a
17   significant amount of cash, no one -- or it's quite uncommon for
18   anyone to question that that money constitutes drug proceeds.
19   Now, why is that?  It's because we know that's where the lion's
20   share of the person's money came from.  I understand drugs are a
21   cash business and fraud is generally not a cash business, but I
22   would submit to the Court that that's a distinction without a
23   difference in this case where we know that the vast majority of
24   the defendant's money in the years in question came from a
25   certain illegal activity.  So here, fraud.
```

```
 1              One of the cases the government cited in its response

 2  brief to the defendant's motion, Melrose East, a Fifth Circuit

 3  case, that court kind of makes this point.  They say in a

 4  proceeds case, the government need not discount the possibility

 5  that some legitimate funds are commingled with the restrained

 6  property, nor need it trace the restrained funds to specific

 7  offenses.  It is enough to show that there was pervasive fraud

 8  in the defendant's businesses and that the defendant acquired

 9  the funds during the time that the scheme was underway."

10              THE COURT:  That case is -- say the name of that one?

11              MR. HUDSON:  It is Melrose East, Your Honor.  And the

12  portion of it --

13              THE COURT:  From?  Which court?

14              MR. HUDSON:  I'm sorry, sir.  The Fifth Circuit.

15              THE COURT:  And that's what year?

16              MR. HUDSON:  The -- oh.

17              THE COURT:  Is it after Luis?

18              MR. HUDSON:  Not after Luis, no, sir.

19              THE COURT:  Okay.

20              MR. HUDSON:  But I do have some post Luis cases.  Luis

21  came out fairly recently, so there are only so many post Luis

22  cases.  I do have some post Luis cases.

23              THE COURT:  Have any of them dealt with this exact

24  issue that we have here?

25              MR. HUDSON:  They have dealt with the burden issue,
```

```
1   not necessarily the issue -- when I say the "burden issue", I
2   mentioned the defendant's threshold burdens under Farmer and the
3   analogous cases before the government has, before the onus is on
4   the government to do anything further.  They have dealt with
5   that issue.  They have not dealt with the cash being fungible
6   issue.
7             THE COURT:  So --
8             MR. HUDSON:  Yes, sir.
9             THE COURT:  -- so on that first issue, pre-Luis, the
10  Jones/Farmer line of cases required that in order to get a
11  hearing to challenge the seizure of the property, that a
12  defendant had to show that he lacked funds to retain counsel?
13            MR. HUDSON:  Yes, sir.
14            THE COURT:  And you're saying several courts have
15  already said that Luis did not do away with the requirement for
16  such a showing?
17            MR. HUDSON:  Yes, sir.  And I can point the Court --
18            THE COURT:  What are those?
19            MR. HUDSON:  Yes, sir.  I can point the Court to a
20  couple cases.  One cited in the government's response brief,
21  United States v. Jones, this is a Seventh Circuit case from
22  2016.  I can give the Court the cite if it will be helpful.
23  It's 844 F.3d 636, looking particularly at Pages 640 through 641
24  as well as Footnote 1 in that case.
25            The gist of what the --
```

1          THE COURT:  And the other?

2          MR. HUDSON:  Oh, yes, sir.  Is United States v.

3   Stokes.  That is a case out of the Northern District of Georgia.

4   The cite on that, I don't -- this one made it into the

5   government's response brief, so the cite on that is 2017 Westlaw

6   5986231 looking around Page 5 of that opinion.

7          THE COURT:  Okay.  And the Seventh Circuit case is

8   what year?

9          MR. HUDSON:  It's 2016.  And the Georgia case, the

10  Northern District of Georgia case I just gave the Court was

11  issued October the 23rd, 2017.

12          THE COURT:  And they both say that Luis did not change

13  the requirement that a defendant must show, in order to get a

14  Farmer hearing, that he lacks funds to retain counsel?

15          MR. HUDSON:  That's correct, Your Honor.  Yes.

16          THE COURT:  Okay.

17          Can I stop you for a second?  I think I may have a

18  issue that I need to deal with.

19          MR. HUDSON:  Of course, sir.

20          (Court and courtroom deputy conferred.)

21          THE COURT:  What I need to do is I have a, there are a

22  lot of people here sitting in the courtroom that I assume are

23  people who are interested in your case.  As I said, I just

24  concluded the evidence in a trial and I have a jury back here

25  deliberating in this criminal trial, and they have a question,

1   and I have all the attorneys now in the courtroom in that case.

2   And I don't want to hold them up in their deliberations.  And so

3   I hate to ask you all to do this, but I think we need to take a

4   recess in this matter and ask you all -- I don't think you need

5   to move your things off the table, you're welcome to leave your

6   things on the tables, but at least it'll free up all those

7   chairs for all the attorneys in my other case, they can come up

8   and we'll deal with that, and if you'll stay close.  Because I

9   hope this won't take long.  Thank you.

10          So, do you know what?  I just, I forgot something.

11  We're going to be having to bring all these defendants in.  So I

12  am concerned about things being on the table.  You can go ahead

13  and have our defendant, Mr. Bank out.  But on the defense side,

14  I think you need to move your things.

15          I'll leave the bench so we can get the defendants

16  assembled also.

17          (Recess taken from 12:10 p.m. to 12:30 p.m.)

18          THE COURT:  Okay.  Where were we, Mr. Hudson?

19          MR. HUDSON:  Yes, sir.

20          THE COURT:  So you were telling me about these two

21  cases, Jones and Stokes.  And I've looked at Jones quickly.  And

22  I do see in the footnote that they do address -- the Seventh

23  Circuit did address the threshold showing and say you still have

24  to show, after Luis, the defendant still has to show he lacks

25  funds to retain counsel.  All right.

1          MR. HUDSON:  And so I also mention the Stokes case

2    that the Court just referenced as well from the Northern

3    District of Georgia.  And there, that court held the fact that

4    the restraint of untainted assets --

5          THE COURT:  Let's see.  That was Star 5?

6          MR. HUDSON:  Star 5, that's correct.

7          THE COURT:  Let me find Star 5.

8          MR. HUDSON:  Yes, sir.

9          THE COURT:  Okay.  So Star 5 on my Westlaw starts with

10   a footnote or an indented quote.  Where are we?  Where do you

11   go?

12         MR. HUDSON:  So Your Honor, I'm sorry to say I don't

13   actually have a copy of the opinion in front of me, but I do

14   know that on page Star 5 there it says "Luis does not change the

15   general rule" -- and I'm quoting from it here -- "it does not

16   change the general rule that, to be entitled a hearing to

17   determine whether assets are tainted, the defendant must make a

18   *prima facie* showing of substantial financial need for those

19   assets."  And I have cases beyond those two whenever the Court

20   is ready for them.

21         THE COURT:  Okay.  So that's the first issue.  And

22   then on the second issue -- we'll wait and see if we need

23   additional cases -- but you don't have anything from our

24   circuit?

25         MR. HUDSON:  I actually do.  That's the next one I was

1  going to get to.  And it doesn't mention -- part of the reason I

2  didn't mention it first is it doesn't mention Luis specifically,

3  but it does post-date Luis.  This is United States v. Johnson,

4  683 F. App'x 241.  This is at Page 49 in particular, from the

5  Fourth Circuit, 2017.  And a quote from that case is "The record

6  also demonstrates that Johnson failed to make a *prima facie*

7  showing that her assets were untainted, so she is not entitled

8  to a hearing under Farmer.  Not even entitled to a hearing, much

9  less any relief under Farmer.

10        And then the other case I have on point I put in the

11  government's response brief, and that's the Hernandez-Gonzalez

12  case from the Southern District of Florida.  I don't know if the

13  Court would like me to give the cite for that now or would like

14  me to wait?

15        THE COURT:  Go ahead.

16        MR. HUDSON:  Yes, sir.  That's 2017 Westlaw 2954676 at

17  page Star 7.  They discuss Luis at length in that case.  And the

18  Court there actually says that the defendant was not entitled to

19  a hearing to challenge the probable cause that certain assets

20  were proceeds where the defendant had not provided "complete

21  financial disclosure to include his assets, liabilities, sources

22  of income, net worth, whether he has access to financial

23  records, and the expected costs of his defense team.

24        The opinion I'm reading from was the report and

25  recommendation of the magistrate judge.  It was adopted by the

```
 1  district court.  I can give the Court the cite for the adoption
 2  on it.
 3          THE COURT:  Hmm-hmm.
 4          MR. HUDSON:  2017 Westlaw 3446815 adopted by the
 5  district court in August of 2017.
 6          THE COURT:  Okay.  So then on the second issue, you
 7  were going to address that too?
 8          MR. HUDSON:  The second issue being?
 9          THE COURT:  Well --
10          MR. HUDSON:  The cash?
11          THE COURT:  The government lacks probable cause to
12  seize property.
13          MR. HUDSON:  That we lack probable cause?
14          Your Honor, in this case I'm --
15          THE COURT:  In other words, do you construe his
16  argument to be that Luis did away with the threshold requirement
17  that not only he lacks funds to retain counsel, but also that a
18  threshold showing by him that the government lacked probable
19  cause to seize the property?
20          MR. HUDSON:  Yes, Your Honor.  I take what he is
21  saying to mean that he has the right to an automatic hearing if
22  he asks for one with respect to the, with respect to the
23  probable cause for the assets in question.  And I think the
24  cases to which I have just cited the Court say the opposite.
25  And there are reasons for the threshold requirements that Farmer
```

1    has put in place.  Part of the reason for the threshold burden

2    is that when the defense gets access to and the ability to

3    cross-examine government witnesses at an earlier stage in the

4    case like this, they're getting access to discovery to which

5    they would not otherwise be entitled under the Constitution or

6    the criminal rules.  The Supreme Court discussed this problem in

7    Kaley.  The Fifth Circuit alluded to it in Melrose East.  And

8    one of the district court cases, Melrose case I cited in my

9    response, came right out and said it.  That's the Simpson case

10   that's on Page 5 of my response brief.

11          But I don't know if the Court has further questions or

12   would like me to go on?

13          THE COURT:  No.  I think we had better hear from

14   defense at this point.  But I have to -- I am curious, did you

15   think that I knew that an administrative claim had been filed?

16   Was there some way that you thought that was before the Court or

17   that I was going to intuit that?

18          MR. HUDSON:  I, I don't, I don't know, Your Honor.  I

19   know they mentioned administrative forfeiture.  I said something

20   about it in my response brief.  I can tell the Court I have

21   information about that.  The during the break I found out that

22   the claim that was -- there were two claims filed on the

23   property in question.  I'll just tell the Court what the

24   earliest one was.  The earliest one was January 24th of this

25   year.  So we're now -- what's today, the 22nd?  We're just

1   before about day 60.  And as I explained under 18 U.S.C. 983,

2   the government has 90 days to do something, file a civil suit,

3   put it in an indictment, give it back.  And I can share with the

4   Court, I wasn't sure before when I was standing up here whether

5   I could share this but I'm told I can share with the Court,

6   April 19th we intend to supersede and we'll be putting this

7   property and more in the superseding indictment.

8           THE COURT:  And that's within the 90 days?

9           MR. HUDSON:  It will -- yes, sir, that would be within

10  the 90 days.  Let's see, January 24th.  I guess approximately

11  April 24th.  Maybe a little later.  Because February only has 28

12  days.  But thereabouts.  It would be maybe the 24th, 26th of

13  April, somewhere around then I think would be our 90-day

14  deadline, and we intend to supersede at the April 19th sitting

15  of the Grand Jury.

16          THE COURT:  So is your view that even if the defendant

17  was entitled to some challenge, that it would be premature to do

18  it before then?

19          MR. HUDSON:  There have been cases where courts have

20  considered Farmer motions based on a seizure warrant, not based

21  on a Grand Jury's finding.  And so based on those cases, I'm not

22  sure it would necessarily be premature.  But on the

23  administrative side of things, the government is certainly

24  complying with its timing requirements there.  We are going to

25  supersede before the 90 days and we will be naming this asset

1   there in the indictment.

2           THE COURT:  And that would be under 983...

3           MR. HUDSON:  Yes, sir.  So in the government's view,

4   we have already complied with 983(a)(3)(C) which says "In lieu

5   of or in addition to filing a civil forfeiture complaint, the

6   government may include a forfeiture allegation in a criminal

7   indictment."  Well, we've already got a criminal indictment that

8   contains a general forfeiture allegation along with some

9   property, just not the property that we found after the

10  indictment was issued.  It wouldn't have been possible to put

11  that in the present indictment.  Once we obtain a superseding

12  indictment, not only will we have complied with that provision,

13  we will have also complied with 983(a)(B) --

14          THE COURT:  (a)(3)?  Oh, yes.  (a)(3)(B)?

15          MR. HUDSON:  (a)(3)(B)(ii)(I).

16          THE COURT:  Okay.  By obtaining a criminal indictment

17  containing an allegation that the property is subject to

18  forfeiture.  But you take the position you have already complied

19  with (a)(3)(C)?

20          MR. HUDSON:  Yes, sir.  That's correct.

21          THE COURT:  Because you did what?

22          MR. HUDSON:  Because there is a general forfeiture

23  allegation in the indictment.  It does include specific

24  property, just not this -- just not --

25          THE COURT:  A general civil forfeiture allegation?

1          MR. HUDSON:  No, sir.  Sorry.  A general criminal

2    forfeiture allegation.  Only a criminal forfeiture allegation

3    can go in an indictment.

4          THE COURT:  Where is that in that subsection?

5          MR. HUDSON:  So the way it reads, "In lieu of or in

6    addition to" -- this would be of course in lieu of -- "filing a

7    civil forfeiture complaint, the government may include a

8    forfeiture allegation in a criminal indictment."  Well, we've

9    got a criminal indictment with a forfeiture allegation.  It

10   doesn't say "naming the specific asset."  So that's why I would

11   urge the Court in the alternative that if at this moment we have

12   complied with (a)(3)(C), but even if the Court disagrees on that

13   front, we will certainly within the 90-day period have complied

14   with (a)(3)(B)(ii)(I) as I described to the Court earlier.

15         THE COURT:  Where does the warrant issued by the

16   magistrate judge here come into play?

17         MR. HUDSON:  It is --

18         THE COURT:  Or does it?  In this scheme?

19         MR. HUDSON:  Well, in this scheme of things it is

20   another probable cause determination.  And it would be -- I

21   suppose you could view it as the government perfecting its right

22   to retain the property for criminal forfeiture because the

23   seizure warrant obtained from Judge Leonard here, if I'm

24   recalling correctly, contained both the civil forfeiture

25   provision for the funds in question as well as the criminal

1  forfeiture provision for the funds in question.  So it

2  authorized seizure under both.  Or its retaining --

3            THE COURT:  You're saying that under (a)(3)(C) that --

4            MR. HUDSON:  No, sir.  It does say -- so it does say

5  if we go -- well, actually, I'm sorry, sir, I didn't mean to cut

6  the Court off.

7            THE COURT:  So you're saying that under (a)(3)(C) --

8            MR. HUDSON:  Yes, sir.

9            THE COURT:  -- there is a forfeiture allegation, a

10  general forfeiture allegation in the existing criminal

11  indictment?

12            MR. HUDSON:  Correct.

13            THE COURT:  So you view that as being sufficient right

14  now.  But you also view the warrant issued by the magistrate

15  judge here to be a, to put a finer point on that forfeiture

16  allegation in your existing indictment?

17            MR. HUDSON:  Yes, sir.  And so going to the second

18  sentence of (a)(3)(C), it says "If criminal forfeiture is the

19  only forfeiture proceeding commenced by the government, the

20  government's right to continued possession of the property shall

21  be governed by the applicable criminal forfeiture statute."  I

22  suppose obtaining the seizure warrant -- without conceding that

23  it would have been necessary to get the second seizure warrant,

24  because I don't think it would have, it was seized pursuant to a

25  search warrant that said that cash could be seized as fruits of

1  the crime as well as evidence of the crime -- but I suppose it

2  could be viewed as an extra-cautious step to perfect the

3  government's right to retain the funds.

4          THE COURT:  Under that second, under that second

5  sentence?

6          MR. HUDSON:  Yes, sir.

7          THE COURT:  So that second sentence of (C):  "If

8  criminal forfeiture is the only forfeiture proceeding commenced

9  by the government."  Is that the case?

10          MR. HUDSON:  It is going to be the case here, Your

11  Honor.

12          THE COURT:  But right now?

13          MR. HUDSON:  Right now under (C), yes, all -- we do

14  not have a civil forfeiture -- civil judicial forfeiture case

15  pending.  The administrative forfeiture which has now been cut

16  off by the filing of the claim, administrative forfeiture is a

17  version of civil forfeiture.  It's just non-judicial civil for

18  the --

19          THE COURT:  So what we have right now is an indictment

20  with criminal forfeiture claim in it or --

21          MR. HUDSON:  An allegation, yes, sir.

22          THE COURT:  Allegation.

23          MR. HUDSON:  At the end.

24          THE COURT:  If criminal forfeiture is the only

25  proceeding commenced by the government.  We have an

1    administrative forfeiture proceeding?

2              MR. HUDSON:  Well, it was actually cut off when they

3    filed the claim.

4              THE COURT:  I see.

5              MR. HUDSON:  When a valid claim is filed, the

6    administrative forfeiture proceeding stops straight away and is

7    referred for judicial forfeiture.

8              THE COURT:  So you're saying that kicks in, that

9    provision kicks in, and therefore the government's right to

10   continued possession of the property will be governed by the

11   applicable criminal forfeiture statute, and then from there,

12   you're saying that the applicable criminal forfeiture statute is

13   what and provides what?

14             MR. HUDSON:  Oh.  So the applicable criminal

15   forfeiture statute in this case is going to be 18 U.S.C.

16   981(a)(1)(C).  That is a civil forfeiture provision; however, it

17   is applicable in criminal cases through the operation of 28

18   U.S.C. 2461(c).

19             THE COURT:  And what does, what do those provisions

20   have to say to the -- how do they support your argument that the

21   warrant issued by the magistrate judge here perfected, acted to

22   sort of perfect your forfeiture allegation in the existing

23   criminal indictment?

24             MR. HUDSON:  Because, Your Honor, one of the ways that

25   the government can seize property for criminal forfeiture is

1    through a seizure warrant.  Now, how does that come into play

2    with the statutes that I have just referenced?  So this requires

3    me to reference another statute.  The second statute that I

4    referenced, 28 U.S.C. 2461(c) provides that the procedures set

5    forth in 21 U.S.C. 853" -- I think it's except for subsection C,

6    except for subsection C I think it is -- "apply to criminal

7    forfeiture proceedings."  And so what does 21 U.S.C. 853 have to

8    say about this?  28 U.S.C. 853(f) is the provision that allows

9    for the issuance of a criminal seizure warrant.  And so the

10   government got that.  And so I'm saying that that helped perfect

11   the government's retention of the property for criminal

12   forfeiture.  I'm not sure that would have been necessary here,

13   again, in light of the fact that we had the search and seizure

14   warrant from the Southern District of Florida to begin with

15   which authorized the seizure of cash at the location, both as

16   fruits of the crime and as evidence of it.  And really I guess

17   my point is this:  The government's obtaining of a second

18   seizure warrant here was more of a precautionary measure than

19   anything else.  I am not saying it was necessary.

20          THE COURT:  But even having the warrant out of

21   Florida, I mean, it looks like you already have (a)(3)(C).

22          MR. HUDSON:  Yes, sir --

23          THE COURT:  -- as a basis.

24          MR. HUDSON:  Yes, sir.

25          THE COURT:  So what does the warrant out of Florida do

1   for you?  Where does that in this scheme provide you with the

2   freedom to keep that, to hold that money?

3           MR. HUDSON:  It allowed us to seize it in the first

4   place.  And so now that we --

5           THE COURT:  Where?  Show me that.  Where does it say

6   that?

7           MR. HUDSON:  Well, it's not there in that statute, but

8   a search and seizure warrant does allow for property to be

9   searched and also to be seized where it fits into certain

10  categories, and those categories the magistrate judge in Florida

11  found were satisfied as to evidence and fruits of the crime.

12  And so that allowed the government to seize it in the first

13  place.

14          THE COURT:  And had the beneficial effect, you're

15  saying, of, after the criminal indictment was filed, sort of

16  perfecting what was done in the criminal indictment on the

17  forfeiture issue?

18          MR. HUDSON:  The indictment under 983(a)(3)(C), I

19  would submit at this point, allows us to retain those funds for

20  criminal forfeiture.  And if there were any doubt about that,

21  certainly Judge Leonard's seizure warrant here, which names the

22  criminal forfeiture authority as well as the civil forfeiture

23  authority, would allow us to hang on to that property.  It

24  authorizes the seizure, and by implication the continued

25  retention of that property for criminal forfeiture.  And

1  proceedings have begun to forfeit that property criminally, both

2  through the forfeiture allegation that exists at present and it

3  will be even -- that forfeiture allegation will be specific as

4  to this $77,000 once we obtain a superseding indictment, I

5  anticipate, subject to the Grand Jury's probable cause finding.

6          THE COURT:  If the defendant were correct that he did

7  not need, after Luis, to satisfy each or both of these

8  requirements, then normally the government would have to come

9  forward at the hearing and show that the property is

10  forfeitable, and where you have an indictment already, you don't

11  have to -- do you have to -- you don't have to show that the

12  defendant committed the charged offense, do you?

13          MR. HUDSON:  In fact, Your Honor, there was a Supreme

14  Court case about that back in 2014, I think.  The case is

15  Kaley -- I don't know whether it's Kaley v. United States or

16  United States v. Kaley, but it's from the -- I have it here

17  somewhere.

18          THE COURT:  134 S.Ct. 1090.

19          MR. HUDSON:  Yes, sir.  That holding in Kaley was that

20  defendants are not entitled to challenge the Grand Jury's

21  probable cause determination as to the crimes alleged in the

22  indictment at a pretrial, post-restraint, i.e., Farmer, hearing.

23  They cannot challenge the Grand Jury's finding that they

24  committed the offenses set forth in the indictment; rather, the

25  challenge is limited only to the nexus between the offense and

37

1   the property in question.

2           THE COURT:  That is, that it is forfeitable?

3           MR. HUDSON:  Correct.  Yes, sir.  That is only issue

4   in a Farmer hearing under Kaley.  You cannot revisit the Grand

5   Jury's probable cause determination with respect to the offenses

6   set forth in there.  And the Kaley court kind of explains that,

7   you know, this would cause quite, quite an issue if a court were

8   able to preside over a trial based on the Grand Jury's probable

9   cause determination where the court had decided that that

10  probable cause determination as to the offenses charged was in

11  error.  Basically the Grand Jury gets the final say on that and

12  that's good enough.  Yes, sir.

13          THE COURT:  Okay.  Thank you, Mr. Hudson.

14          MR. WANDNER:  I don't know if anyone else's head is

15  spinning, but mine sure is.

16          THE COURT:  Well, I did ask Mr. Hudson, to be fair, to

17  prognosticate a little bit about how he interpreted your filing.

18          MR. WANDNER:  Yes, Judge.

19          THE COURT:  Do you want to tell me how you interpret

20  it or what you intended it?

21          MR. WANDNER:  Judge, certainly lot going on here,

22  Judge.  Judge, sounds like to me the bottom line is -- and even

23  in Jones, the case that they cite, the Jones court, while it did

24  make some *dicta* that the Luis court may or may not have been

25  expanded, that was a plain error analysis because the defendant

never asked for a hearing and the Court never conducted an evidentiary hearing. It sounds like to me that this court needs to conduct an evidentiary hearing to go over the issue of the nexus. We make a claim in our motion for return of property, and to some degree, whether or not Farmer was overruled, because I don't necessarily think we need to get to that point, we've clearly made a claim in our second paragraph in our motion for return of property that it is the position of the defendant that pursuant to Luis and U.S. v. Chamberlain, that those funds we're specifically talking about, the 77,000 in cash, cannot be linked to any of the offenses alleged in the indictment and are needed for attorney's fees and costs associated with the defense of this case. And I can tell the Court if any argument or representations need to be made in this record, we desperately need same. The United States has a team of three attorneys and there's about six people in the front row all dedicated to this case. And while Mr. Bank has been able to retain Mr. Broccoletti and I, we do not have one dollar for experts. This is a case that experts are absolutely necessary. We do not have money to transport defense witnesses from all over the country that we anticipate needing. There are depositions from various civil cases that we cannot transcribe. So there is a desperate need on our end of the ledger for monies. And if that motion doesn't speak clearly enough, the other motions that we have filed regarding the property and what-not clearly state the

 1    desperate financial state.  As the Court I'm sure knows, their

 2    home has been restrained, properties that they own have been

 3    restrained, every dollar that was in any bank account has been

 4    restrained.  There is absolutely not a single additional dollar

 5    that can be used for costs in relation to the case.  So clearly

 6    our Paragraph 2 of our motion, to the extent that their argument

 7    is that Farmer needs to be satisfied, has clearly been

 8    satisfied, and if there's some evidence that the Court --

 9              THE COURT:  On the first, you're saying on factor one?

10              MR. WANDNER:  Correct.

11              THE COURT:  That is, you have to make a threshold

12    showing to get a Farmer hearing that you lack funds to retain

13    counsel.  And are you appointed or are you retained?

14              MR. WANDNER:  No, Judge, it's not to retain counsel.

15    It's for defense-related costs.  Also part of the inquiry.  It's

16    not just retention of counsel, it's also defense-related costs

17    such as experts in this case.  Clearly a forensic accountant

18    would be necessary.  Again, costs related to bringing witnesses.

19    All those costs are part of the defense.  And those -- clearly

20    we will make the, we'll be able to make the requisite showing,

21    not arguing that we need to make that finding because we do

22    believe Luis has changed that landscape --

23              THE COURT:  Do you have any case that says that?

24              MR. WANDNER:  That the costs --

25              THE COURT:  No.  Do you have any case that says Luis

1  changed the landscape such that now you do not have to make such

2  a threshold showing?

3          MR. WANDNER:  I don't, Judge.  The Jones case of

4  course talked about it and it didn't -- it didn't say it one way

5  or the other.  They acknowledge that the defendant was making

6  that argument and they state Jones may read Luis too

7  expansively.  Luis says nothing about timing or burden-shifting,

8  but then they go on --

9          THE COURT:  Well, what about the footnote?

10         MR. WANDNER:  If you look at Headnotes 3 and 4 within

11  the body of the case, Page 640.

12         THE COURT:  A headnote?

13         MR. WANDNER:  Not the headnote but... numbers three

14  and four.

15         THE COURT:  Yes.  I'm with you.

16         MR. WANDNER:  "Jones may read Luis too expansively.

17  Luis says nothing about timing or burden-shifting.  But even

18  assuming without deciding that Jones' interpretation of Luis is

19  correct, that case would have offered Jones at best an

20  additional line of attack on the district court's restraining

21  order."  And what it goes on to say is "If the district court

22  finds the defendant has insufficient alternative assets with

23  which to pay counsel but the government fails to justify its

24  retention of all the frozen assets, then the court must order

25  the release of the funds in the amount necessary to pay

1   reasonable attorney's fees for counsel of sufficient skill."

2           It goes on to say that he never made that request.

3   And that's why under plain error he received no relief.

4           If you go on to Page 642.  In that case the defendant

5   had significant other assets, some of which had been restrained

6   but then those restraints were released and ultimately he had

7   assets, so that wasn't an issue.  And he never asked for an

8   evidentiary hearing or hearing of any kind.

9           Here, we're clearly asking for a hearing.  It seems

10  clear from Jones that a hearing is necessary should the

11  defendant have asked for it.  We're certainly asking for it.

12  And even under the argument counsel just made regarding Kaley,

13  while we may not be able to challenge the probable cause

14  analysis regarding the underlying crimes charged, we certainly

15  have the right to challenge the nexus.

16          And the interesting thing, Judge, about the nexus is

17  not only is -- I mean, they say that they have complied with

18  983.  They haven't returned the property, there is no civil

19  complaint, and they have not included this cash in the

20  indictment.  All of this has been a response to the filing of

21  our motion for return of property.  So while they say they

22  intend to supersede, they haven't yet done so, and we clearly

23  have the right to argue the lack of nexus and lack of probable

24  cause.  And in fact in the affidavits that support both the

25  indictment and the -- excuse me, their response, the only cash

 1  that's discussed is discussed having been withdrawn from an

 2  account back in, before 2015.  2013 to 2015.  Nothing in the

 3  past two years from the date of 2015.  And remember, their --

 4  the time frame of their allegations of the criminal conduct was

 5  basically up to 2015.  There are some arguments that some

 6  representations were made later on.  But in terms of tracing of

 7  money, they have absolutely no proof that any of the cash

 8  sitting in 2017 at Mr. Bank's home that was seized is traceable

 9  to any of these transactions.  And as a matter of fact, at the

10  PTD hearing I examined the special agent, one of the special

11  agents, and I believe -- the transcript is part of the record --

12  I believe I asked him "Do you have any proof that the cash found

13  at the house is traceable to any of the illegal transactions or

14  allegedly illegal transactions?"  And my recollection of his

15  answer was, "No".

16          So whether or not they claim that there was illegal

17  transactions or whether or not there's probable cause for this

18  indictment to go forward, the fact of the matter is they have no

19  evidence that the cash found in his house was traceable to an

20  illegal conduct.  And that's exactly what Luis was talking

21  about.  It even discussed Justice Kennedy's --

22          THE COURT:  But that was concededly untainted

23  property.

24          MR. WANDNER:  Well, then that's the issue.  If Luis is

25  only saying -- if Luis is limited to those situations where the

 1  parties both concede it's untainted, then I think we're

 2  restricting Luis to a very great degree.  I think Luis --

 3         THE COURT:  There's a plurality decision with

 4  significant concerns reflecting concurring opinions.  I think

 5  you need to be extremely careful about how far you read Luis.

 6         MR. WANDNER:  I understand, Judge.  But I don't think

 7  any of the one or two cases that are out there subsequent to

 8  Luis preclude our ability to obtain an evidentiary hearing to

 9  prove the lack of nexus.  Because if they just make an

10  allegation in order to restrain what we argue is untainted

11  assets, then they can basically get around what Luis says they

12  can't do, which is restrain untainted assets.  Your Honor, since

13  they have not filed a civil complaint, they're clearly placing

14  these funds in Your Honor's jurisdiction.  Your Honor has the

15  right, the jurisdiction and the discretion and obligation under

16  Luis to conduct a hearing to determine whether or not they have

17  proven a nexus between the funds that we're claiming are

18  untainted and the funds that they're claiming are not.

19         THE COURT:  Any other judge ever say that since Luis?

20         MR. WANDNER:  I can't say one way or the other, Judge.

21  This is the first time I'm arguing these issues.  But I think

22  Jones, again, they brought up Jones, I'm glad they did, we ran

23  upstairs, got a copy of it.  It clearly states why didn't he ask

24  for a hearing?  Why didn't he object?  Those assets were -- it

25  seems to me from a reading of Jones --

```
1              THE COURT:  Well, wait.  Comes right at the end of the
2   U.S. v. Moya Gomez citation that you just read to the end of.
3   Their explanation.  "As explained below, Jones has not shown a
4   bona fide need for the restrained assets, thus, as in Phillips
5   this case presents an inadequate vehicle by which to consider
6   the issue."  I read that as a threshold showing requirement.  Am
7   I missing something?
8              MR. WANDNER:  Even if that's the case, we have
9   complied with that in our motion for return of property where we
10  make the statement that funds are not linked to a criminal
11  offense and the funds are needed for attorney's fees and costs.
12  I don't see where there's any other -- assuming we still have
13  that burden, without giving up on that argument -- assuming we
14  still have that burden, we have passed that threshold by making
15  that statement in our motion.  And again, I can, at an
16  evidentiary hearing, we will certainly present sworn testimony
17  on the need for the costs and the need for the money to be
18  returned, assuming the Court finds them to be untainted.
19             THE COURT:  And you think that assuming the
20  requirement still exists, that just making that statement in a
21  motion is enough to get you over that threshold?
22             MR. WANDNER:  I certainly believe that, Judge.  I
23  don't see any requirement we have to file an affidavit or any
24  other vehicle to make a prima facie case.
25             THE COURT:  It sounds like a hollow threshold if
```

1    that's the case to me.

2            MR. WANDNER:  That's why hearings are heard, Judge.

3    We ask for relief, we present evidence in support of the relief,

4    and we're ready to present that whenever the Court sets the

5    hearing.

6            THE COURT:  And you're ready to, you're saying, now

7    present the threshold evidence on that issue and the threshold

8    evidence on the requirement that you show the government lacks

9    probable cause to seize property?

10           MR. WANDNER:  Judge, if the Court orders us to.

11           THE COURT:  You're prepared to present testimony on

12   this?

13           MR. WANDNER:  If the Court orders us to proceed, I'll

14   do the best I can.  I would prefer to have, to the extent the

15   Court suggests that we need to comply with that obligation, I

16   would suggest a recess so that we can get our affairs in order

17   to present that.  If the Court says we need to go now, then

18   we'll go now.

19           THE COURT:  Why, so what...

20           That brings up this issue that the government raised

21   that we're going to have, sounds like, a superseding indictment

22   being sought.  And assuming that the Grand Jury issues a

23   superseding indictment on April 19th, what does that do to your

24   argument?

25           MR. WANDNER:  Well, it sounded like to me, Judge,

1  regarding a case that Mr. Hudson cited, U.S. v. Kaley and I

2  confess I don't have a copy of it, but it sounded like to me

3  from what he was stating is that while the defendant does not

4  have the authority to challenge the probable cause of the

5  criminal charges, which I agree with that to that degree, we do

6  have the right to challenge the nexus between the charges and

7  the property sought to be restrained or to be given back.  So

8  that all falls under the same rubric, I would suggest, that we

9  have the right to challenge their claim that the property is

10 tainted when we claim it's not.  Specifically as it relates to

11 pretrial restraint of assets under Luis.  Because if ultimately

12 those assets were not tainted, we have lost the ability to use

13 them in our own defense.  That's why the Court must consider

14 these issues before a trial so that, if the Court makes a

15 determination that they're not tainted, that we have the right

16 to use them in support of our case.  If the government just

17 simply gets an indictment, they can prevent us from using those

18 assets, ultimately if their indictment was, you know, flawed or

19 whatever the case may be, we haven't had a chance to challenge

20 it, we've lost the ability to use those assets.

21         The Court clearly has the discretion and authority and

22 I believe an obligation in this matter to conduct a hearing on

23 the issue of whether or not the funds are tainted.  Jones

24 certainly seems to suggest that.  I know Luis, it seems like

25 there was perhaps a, the question of whether the assets were

 1   tainted or not seemed to not be in dispute.

 2           THE COURT:  So you're saying that even if we were in a

 3   context, a different context where the government had already --

 4   the indictment before the court, much like what the government

 5   is arguing will be coming, already contained an allegation that

 6   the specific property, the 77,000 and change, was subject to

 7   forfeiture.  Even if that's where we were right now, that he had

 8   within the existing indictment specifically stating 777,000 and

 9   change is forfeitable criminally, you're saying that you would,

10   upon a showing that you lacked funds for defense-related costs

11   and that you made some showing that the government lacked

12   probable cause, that the government would then have to come

13   forward and prove nexus?

14           MR. WANDNER:  Judge, I think that that's, under

15   Farmer, I think that's still the law.  Again, assuming Luis

16   hasn't changed the landscape as it relates to Farmer, I think

17   Farmer says that.

18           THE COURT:  All right.

19           MR. WANDNER:  Farmer says you can --

20           THE COURT:  I should hear from Mr. Hudson again.

21           MR. HUDSON:  Well, Your Honor, courts have considered

22   how much the defense has to offer in order to get to the point

23   where they can actually even have a hearing.  And so some of the

24   cases I can -- and merely making an allegation doesn't suffice.

25   Courts have held that defendants cannot rely on self-serving

1  statements to meet the Farmer requirements, nor can they just

2  make bald allegations.  I can offer the Court a couple --

3           THE COURT:  So you need an affidavit at least --

4           MR. HUDSON:  At --

5           THE COURT:  -- which is my gut --

6           MR. HUDSON:  Yes, sir.  At a very minimum.  And

7  actually one of the cases I cited the Court to earlier talks

8  about that, was that Hernandez-Gonzalez case from the Southern

9  District of Florida that I cited the Court to earlier.  It's

10 contained in the government's response brief.  And there in

11 Hernandez-Gonzalez, the Court says that the defendant wasn't

12 even entitled to a hearing where he hadn't provided complete

13 financial disclosures.  That's the court's words, not mine.

14 Complete financial disclosure.  The court said "His assets,

15 liabilities, source of income, net worth, whether he has access

16 to financial accounts and the expected costs of his defense

17 team."  That court doesn't stand alone.  That's just a post Luis

18 case on point.

19           There is another case I can cite the Court to, United

20 States v. Vogel from the Eastern District of Texas.  2010

21 Westlaw 547344 at page Star 3.  Court there said "Defendant

22 cannot rely on a self-serving statement regarding the legitimate

23 source of the property to satisfy the second requirement" under

24 their case law that is analogous to Farmer that they have in the

25 Fifth Circuit.  Pretty much every circuit has a case that is

1   analogous to _Farmer_.

2          THE COURT:  _Jones_ and then --

3          MR. HUDSON:  There's _Jones_ in the Tenth Circuit, yes,

4   sir.  There's _Farmer_ in the Fourth Circuit.  There is _Melrose_

5   _East_ and _Holy Land Foundation_ in the Fifth Circuit.  _Moya Gomez_

6   in the Seventh.

7          THE COURT:  So your view is first you argue that

8   defendant is incorrect in his assertion that _Luis_ changed the

9   landscape on what the threshold showing must be?

10         MR. HUDSON:  Yes, sir.

11         THE COURT:  And you've pointed to case law.  And

12  secondarily you're arguing even if -- well, assuming that the

13  defendant is incorrect, that to meet the threshold requirement

14  he's got to do a complete divulging of his finances and explain

15  what defense-related costs he may have?  I assume that in that

16  regard you wouldn't have an objection to some kind of, on the

17  defense-related cost aspect, there being some kind of _ex parte_

18  showing by defense so they weren't divulging all of their

19  strategy?  That seems common sense to me.

20         MR. HUDSON:  I understand that concern, Your Honor.  I

21  wonder if they could also file something perhaps somewhat pared

22  down publicly just so if it comes to a point where we have to

23  have another hearing or further briefing on the matter, that the

24  government can intelligently respond to or attempt --

25         THE COURT:  A gross amount.  A gross amount with an _ex_

1   *parte* breakdown explaining it, might be the way to do that.

2   That is, I expect defense-related costs are $200,000, for

3   example, and then explain why that is to me in an *ex parte*

4   filing.

5           MR. HUDSON:  Yes, sir.

6           One thing.  The Court's saying $200,000 made me think

7   of something, and I do want to mention it before we go too much

8   further.  I do want the Court to know that we have actually

9   already released approximately $275,000 worth of assets to this

10  defendant.  And the Court is aware?  You have that, it sounds

11  like that?  Yes, sir.

12          THE COURT:  Yeah.

13          MR. HUDSON:  But I actually, I don't know if the Court

14  wants me to offer -- the last case I told the Court about was

15  United States v. Vogel.  I don't know if the Court wants to me

16  to give the Court any other cases.  I have plenty of other cases

17  I can give the Court on this point.

18          THE COURT:  They're not in your brief?

19          MR. HUDSON:  Some of them are.  Hernandez-Gonzalez

20  certainly is.  I think the other one I was going to cite, United

21  States v. Marshall from the Northern District of West Virginia.

22          THE COURT:  What's that cite?

23          MR. HUDSON:  That's 2015 Westlaw 4139368.  And there's

24  one other, but it's in the government's brief.  I know this

25  one's in the government's brief.  United States v. Jamiesson, a

```
 1   published district court case, Northern District of Ohio.  I
 2   don't know if the Court wants me to give the cite or just rely
 3   on --
 4            THE COURT:  No, that's fine.
 5            MR. HUDSON:  Thank you, sir.
 6            THE COURT:  So you agree that that factor, that
 7   threshold factor includes defense-related costs, not just
 8   retention of counsel?
 9            MR. HUDSON:  That would probably be for
10   defense-related costs too.  I cannot think of case law --
11            THE COURT:  That makes sense.
12            MR. HUDSON:  -- off the top of my head that says that.
13   But without ever, you know, waiving my ability to make that
14   argument in the future should case law arise on that point that
15   I become aware of, I agree with the Court, it makes sense.
16            THE COURT:  And on the threshold requirement that the
17   defendant must show the government lacks probable cause to seize
18   the property, counsel has pointed to various filings for that
19   proposition.  But does this threshold showing contemplate a
20   hearing, a threshold hearing being held or a filing that has to
21   be made by -- from which the Court then determines after
22   briefing whether such a threshold showing has been made?
23            MR. HUDSON:  The latter, Your Honor.  So under Farmer,
24   they actually -- in the Farmer case they use the word threshold
25   to refer to these types of showings.  And that's, that would
```

1    make sense, if that word means anything there, that it is a

2    threshold showing they have to make.

3           There's another case, I was flipping around there at

4    the table trying to find it before I came up here.  There is a

5    case I'm aware of that -- it may be, it may be the Simpson case

6    from the Northern District of Texas that I cited in my brief.

7    It may be.  I feel like this is a case from a distinct court

8    somewhere in Texas, and I think it might, might be the Simpson

9    case.  I haven't put my finger on it just yet.  But I've seen it

10   before where the court says this is a threshold requirement in

11   order even to get a hearing.  In order to even get a foot in the

12   courtroom, a defendant needs to make those threshold showings.

13   And this would be supported by one of the cases that I told the

14   Court about earlier from the Fourth Circuit from 2017 United

15   States v. Johnson.  And in Johnson the passage that I read the

16   court from Johnson, "The record also demonstrates that Johnson

17   failed to make a *prima facie* showing that their assets were

18   untainted, so she is not entitled to a hearing under Farmer."  I

19   mean that seems --

20          THE COURT:  Untainted means that the government lacks

21   probable cause to seize the property?

22          MR. HUDSON:  Correct.  And that seems to suggest you

23   can't even get a foot in the courtroom until you, in your

24   filings, make that threshold showing.

25          THE COURT:  And so if I were to hold that there's no

53

1  threshold showing that's been made at this point, and then the

2  defendant did pull together an affidavit and submitted all that

3  the day before April 19th when the Grand Jury is meeting and you

4  say a superseding indictment is going to be issued --

5          MR. HUDSON:  Yes, sir.

6          THE COURT:  -- what happens by the issuance of a

7  superseding indictment in this case that specifically names the

8  $77,000 and change as being forfeitable?

9          MR. HUDSON:  Well, it'll give us yet a third probable

10  cause finding as to this cash, two from a magistrate judge or --

11  from two different magistrate judges and then one from the Grand

12  Jury as well.

13          THE COURT:  But what does it do -- assuming that once

14  I review all the information I find that the threshold showing

15  has been made, what does it do to the defendant's right to a

16  Farmer hearing?

17          MR. HUDSON:  Then they get a hearing.  If they meet

18  those two threshold requirements, then they get a hearing.

19          THE COURT:  Even though you've got the additional

20  superseding indictment with specific property being, there being

21  probable cause --

22          MR. HUDSON:  Yes, sir.

23          THE COURT:  -- that a probable cause finding that

24  specific property is tainted by the criminal conduct which is

25  the same probable cause showing the magistrate judge in this

1  case has already determined that is probable cause?

2         MR. HUDSON:  Yes.  That's correct, Your Honor.  So,

3  and that was kind of the point of the Kaley case, as the Court

4  is aware, from the Supreme Court, that in a hearing like this, a

5  Farmer hearing or a Monsanto hearing as the Court referred to it

6  as earlier, you get to challenge the nexus, yes, and then the

7  case law from different circuits, including the Fourth Circuit,

8  makes clear that you have to make the threshold showings to get

9  there, but you can challenge that nexus provided you make those

10 threshold showings, but you cannot go back and challenge the

11 Grand Jury's determination as to the offenses listed in the

12 indictment.

13        So to answer the Court's question, yes, if a Grand

14 Jury issues an indictment specifically listing the property in

15 question, this $77,000 and presuming the defendant makes the

16 proper threshold showings, I'm not sure I've ever seen any case

17 law, though I can't say I've looked for it, on the issue of can

18 you make a successive Farmer motion.  But I guess setting that

19 issue aside for the moment, yes, they would have the right to

20 a Farmer hearing should they meet the two threshold requirements

21 from Farmer.

22        THE COURT:  Whether it's before the indictment or

23 immediately after?

24        MR. HUDSON:  That would be right, yes, Your Honor.

25        THE COURT:  Well, under your theory, your reading of

1    the case law, we clearly have no threshold showing having been

2    made at this point.  Do we have enough for me to even interpret?

3    I mean, they didn't ask for a _Farmer_ hearing.  Do I even have a

4    _Farmer_ motion before me?

5            MR. HUDSON:  That is an interesting question, Your

6    Honor.  I don't know.  I would submit no, because I did my best

7    in responding to interpret the two pages best I could, but it

8    does not, it doesn't even mention _Farmer_.  It doesn't mention

9    the framework that we've been discussing today that the court

10   has to go through to consider these issues.  All of that came in

11   the government's response.  And that was based off of my reading

12   of what they meant in their two-page motion.  It was just so

13   bare-bones, Your Honor, and I'm not sure the Court can say it

14   properly has a _Farmer_ motion before it.  I don't know.  I would

15   have to think about it more.

16           THE COURT:  That scares me a little bit, Mr. Hudson.

17           MR. HUDSON:  I'm sorry, Your Honor.

18           THE COURT:  All right.  We have this other issue.  You

19   know, we're going to take a lunch break.  I'm not working all

20   the way through.  I just finished seven weeks of a murder trial.

21           MR. HUDSON:  Yes, sir.

22           THE COURT:  So I will tell you all what I think on

23   this, whether I'm going to rule or whether I'm going to issue a

24   opinion on this issue, but probably will just rule when we come

25   back.  Then we have the motions _in limine_, motion _in limine_ with

 1  respect to numerous questions which, frankly, I've looked at it

 2  and doesn't seem like it's going to take up a lot of time to me.

 3  But that's where I am.

 4          So it's 1:35.  Why don't we come back at 2:35 and

 5  hopefully I won't have any jury questions in the meantime.

 6          Thank you, Counsel.

 7          (Recess taken from 1:35 p.m. to 3:38 p.m.)

 8          THE COURT:  All right.  Mr. Wandner?

 9          MR. HUDSON:  Your Honor sir?

10          THE COURT:  All right.  Let's come to order, please.

11          Mr. Wandner, did you want to make some more comments?

12          MR. WANDNER:  Indeed, Judge, if the Court would give

13  me a few moments I would really appreciate that.

14          THE COURT:  So just so you know where I am, it really

15  does seem to me that you need to make the threshold showing and

16  that Luis hasn't changed that, and that you need to do more.  I

17  looked back at your motion.  It doesn't mention Farmer.  I'm

18  going to -- I'm happy to construe it as a Farmer motion, but I

19  think it doesn't -- my preliminary view is it doesn't do what it

20  needs to do.

21          MR. WANDNER:  Okay.

22          THE COURT:  If you want to try to dissuade me from

23  that, I'll give you a few minutes to do that.

24          MR. WANDNER:  I appreciate it.

25          THE COURT:  Yes, sir.

```
 1          MR. WANDNER:  Judge, it seems to me under Luis that

 2   because the parties had agreed that the money was untainted that

 3   was being restrained and that the defendant needed the money

 4   that was restrained for attorneys, they never got to these

 5   questions.  And so of course the Court only has so much law out

 6   there to try to make these determinations and we understand

 7   that.

 8          I went back over the break, Judge, and I reread US v.

 9   William Todd Chamberlain, case dated August 18th, 2017, a Fourth

10   Circuit case.  As new as you can get on this issue.  And it

11   follows Luis.  And while we cited it in our motion, I didn't

12   necessarily argue it to the extent that I should have in our

13   earlier setting today, Judge.  But I think it's critical that I

14   do so.

15          THE COURT:  Okay.

16          MR. WANDNER:  On Page 10 of that decision, the Fourth

17   Circuit states, "Because the court's Constitutional holding" and

18   by "court" they mean the Luis court -- "because the Luis court's

19   constitutional holding did not rest on a close reading of the

20   statute, the court was not called upon to consider, much less

21   decide, whether Section 853(e) permits pretrial restraint of

22   untainted property that is not needed to retain counsel."

23          So then when you -- and then the court goes on to say

24   "Nonetheless, the Luis court discussion of Section 853 and

25   pretrial restraint more generally presents an opportunity to
```

1   revisit our existing interpretation of that provision."  So then

2   they go on to analyze it from that perspective.  They point out

3   the Luis decision where it states specifically, the Luis

4   plurality explained that "Unlike tainted assets, the defendant's

5   ownership of which is necessarily imperfect, untainted assets

6   belong to the defendant, pure and simple."

7         Now of course I understand that the issue of whether

8   it's tainted or not is in dispute.  The government has agreed

9   that at some point a hearing is necessary.  The issue again is

10  who needs to make the prerequisite showing, and I would suggest

11  that the Fourth Circuit --

12        THE COURT:  I guess they have agreed that a hearing is

13  necessary if the showing is made.

14        MR. WANDNER:  Correct.  Correct.  So what I would

15  suggest to Your Honor is that the Fourth had this in mind when

16  it decided Chamberlain because it specifically questioned that

17  Luis didn't answer this.  And the last page of Chamberlain

18  states "With the benefit of these continuing developments, i.e.,

19  the Luis decision as well as the most recent pronouncements of

20  the Supreme Court and the government's own evolving views, it is

21  now apparent that our existing precedent construing Section 853

22  cannot be maintained, and that reconsideration of our minority

23  rule is appropriate."  By its plain text, Section 853(e) permits

24  the government to obtain a pretrial restraining order only over

25  those assets that are directly subject forfeiture as property

1    traceable to a charged offense.  Consequently, our precedents to

2    the contrary are overruled," et cetera.

3           So the Fourth Circuit knew exactly that there was a

4    question left unanswered from Luis.  They said it right plain

5    and simple.  And in its holding it makes no difference to the

6    Fourth Circuit, in my humble opinion, my argument on behalf of

7    our client, is that it had the opportunity in Chamberlain to

8    state exactly what the government would suggest the remaining

9    law is after Luis, is that we still need to make a showing of

10   need for purposes of cost, counsel fees, et cetera.

11          My suggestion to Your Honor is that Chamberlain now

12   goes beyond that.  It indicates that if the money is untainted,

13   which is still subject to a hearing when it's disputed, and we

14   very well may need to make a preliminary showing through

15   affidavit or otherwise that it is untainted -- doesn't say that

16   we don't need to do that -- but as to the second prong, my

17   argument relates simply to the second prong of showing of need,

18   it seems to me that the Chamberlain court, which had the

19   opportunity to state that we still need to make a showing of

20   need because it clearly references that the Luis court did not

21   rule on that, its ruling is clear:  If it's not tainted, not

22   traceable, it needs to be returned.

23          So my suggestion to the Court is while, even though we

24   believe Luis maintains all the obligations on the government's

25   side based on Chamberlain, we suggest that, at very least, the

1    second <u>Farmer</u> element of us having to show, meaning the

2    defendant having to make a preliminary showing of need, is no

3    longer applicable at least in the Fourth Circuit so long as the

4    monies in dispute are ultimately determined to be untainted.

5            THE COURT:  It seems circular to me.  I'm not sure

6    that -- how do you get there in the first place?  You're saying

7    if they're ultimately shown to not be tainted.

8            MR. WANDNER:  Because we have a right to a hearing.

9    Everybody agrees that we have a right to a hearing.

10           THE COURT:  If you're there.  If you get there.  If

11   you get over your threshold showing.

12           MR. WANDNER:  Right.  I'm suggesting is -- let's just

13   say, again, there's an A and a B.  If we get over the threshold

14   of showing to the Court that the monies in question, $77,000,

15   are untainted, then we have a right to a hearing.  The other

16   element is do we have a need for it in terms of defense costs.

17           THE COURT:  Well, the two threshold showings for

18   getting your hearing are that you lack funds for your

19   defense-related costs and that the government lacks probable

20   cause to seize the property.

21           MR. WANDNER:  Correct.

22           THE COURT:  You're saying if you make your showing on

23   the second one and then we get to the hearing where the

24   government gets to make a showing of its own?

25           MR. WANDNER:  Correct.  So what I'm suggesting is

```
 1   while the first element there's a question mark whether we need
 2   to make that preliminary showing of that the money's not
 3   tainted, we still believe the government's obligation to do
 4   that, but that being said, it really is the second element that
 5   we need not show, at least my reading of Chamberlain, we need
 6   not show the need, even though we certainly can show it and we
 7   certainly do need it.  And if the Court orders us to do it, we
 8   will do it.  My suggestion is under Chamberlain, the Fourth
 9   Circuit accepted that there was a question mark on that
10   particular question after Luis, and despite that, ruled simply
11   that if the money is untainted, it goes back to defendant for
12   whatever reason.  They did not mandate that there be a need for
13   it to be used for costs or what-not.
14           THE COURT:  All right.  Thank you.
15           MR. WANDNER:  Thank you, Judge.
16           THE COURT:  Mr. Hudson, just on Chamberlain, do you
17   want to briefly respond to that new argument?
18           MR. HUDSON:  I'll be extremely brief, Your Honor.
19   Chamberlain is a pretty straightforward case.  It holds that the
20   government may not restrain substitute assets pretrial, at least
21   not under 21 U.S.C. 853(e), which was the statute that was prior
22   to Chamberlain most often cited for that purpose.  What doesn't
23   Chamberlain talk about?  It doesn't comment on the framework to
24   be used in this type of situation; that is, where the defendant
25   is trying to recover funds seized for forfeiture pretrial.  I
```

1    would submit to the Court that it's very telling that

2    Chamberlain makes no mention whatsoever of Farmer, a Fourth

3    Circuit case that is a published opinion and decided some time

4    in the early 2000s, I forget exactly what year.  Chamberlain is

5    an eight-page-long opinion discussing a number of Fourth Circuit

6    cases and explicitly overruling some, but it doesn't have so

7    much as a whisper about Farmer.  I would submit to the Court

8    that the reason for that is because the Fourth Circuit saw no

9    tension between Farmer and Chamberlain.  The Fourth Circuit

10   identified the cases in Chamberlain where there was tension

11   between Chamberlain and their holdings in those prior cases,

12   specifically United States v. Bromwell, United States v. Bolen

13   and United States v. McKinney.  No mention Farmer, no mention of

14   the framework.  I submit to the Court that the Fourth Circuit

15   didn't pass on the framework; that is, the requirement to get a

16   Farmer hearing in Chamberlain, it just stated the general rule

17   about restraining or seizing substitute assets pretrial.

18         And not to go back through them, but I would just

19   point the Court back to Jones from the Seventh Circuit, Stokes

20   from the Northern District of Georgia, and Hernandez-Gonzalez

21   from the Southern District of Florida, all post Luis, all

22   talking about this topic.  And I think they're on point.

23         Unless the Court has any questions, that would be my

24   argument.  Thank you, sir.

25         THE COURT:  Matthew, can you step up here?

```
 1              (Court and law clerk conferred.)

 2              THE COURT:  So I think that I'm still of the view that

 3   Luis did not change the threshold framework previously

 4   established, and I think that on the threshold showing issue,

 5   that, you know, what I'm -- I'm going to do is I'm going to deny

 6   your original Farmer motion.  The clerk will note on the docket

 7   that I've denied the motion without prejudice to your right to

 8   refile it with appropriate support, the kind of support that's

 9   discussed in the Hernandez-Gonzalez case to include a statement

10   of what you anticipate your costs, defense-related costs to be.

11   And publicly you can give a total figure and then you can file

12   an ex parte, under-seal filing on the docket reflecting how you

13   break that down, what you expect to be needed, for what purposes

14   in general terms, and then, you know, and why this is the kind

15   of case that justifies those kind of figures.

16              And then as to the second threshold requirement; that

17   is, that you make some threshold showing that the government

18   lacks probable cause to seize the property, you know, you need

19   to also include that.  It needs to be something in the nature of

20   affidavits and -- you know, you mentioned some examination of

21   one of the government witnesses.  If you have transcripts,

22   things of that nature, you can attach those.  But I need

23   something substantive to show me that there's enough there to

24   justify putting the government to the burden and the test of

25   coming back in here, presenting evidence, bringing people in and
```

1   them then having to show probable cause that the defendant

2   committed the charged offense and the property is forfeitable.

3   And it seems to me that Kaley addressed the issue of the

4   defendant committing the charged offense at one level, but I'm

5   sure the government would be prepared to address all of that at

6   a hearing.

7          This matter is scheduled for trial in September right

8   now, I think.  And I never get involved in any discussions, but

9   if you all find that you think there's something that I can rule

10  on that can help you move along in your representation, always

11  let me know of that.  And I will await whether you file

12  something else, and it's good to have had you all.

13         Is there anything else you'd like me to do?

14         MR. BROCCOLETTI:  Yes, Your Honor.  We still have the

15  motion *in limine*, if the Court has the ability to hear that.  We

16  can certainly -- I don't think that would take long, but it's up

17  to the Court.

18         THE COURT:  No, we'll do it.  We'll do it.  I need a

19  comfort break.

20         MR. BROCCOLETTI:  Yes, sir.

21         THE COURT:  Maybe 10 or 15 minutes.

22         (Recess taken from 3:56 p.m. to 4:14 p.m.)

23         THE COURT:  All right.  So we turn next to the first

24  motion *in limine*.  And as I read the motion, you're requesting a

25  ruling on five categories of evidence regarding the victims'

1   actual losses, the cumulative amount of all victims' actual

2   losses, the victims' collateral consequences and victim impact

3   evidence involving the personal or emotional hardship caused by

4   the victims' losses, and then the victims' vulnerability to

5   fraud.  The government has represented that it does not intend

6   to present any evidence as to the victims' collateral

7   consequences at trial or other victim impact evidence.  And so

8   I'd like to -- I appreciate some confirmation that the

9   government agrees that evidence on those two categories should

10  be excluded.  That's, again, the victims' collateral

11  consequences and other victim impact evidence.  So will the

12  government confirm that that is their position, that they don't

13  intend to offer that?

14          MS. O'BOYLE:  Yes, Your Honor.  Victim impact

15  testimony has its place at sentencing.  And the government's

16  tried several fraud cases.  We, we have no intention on direct

17  testimony eliciting how the loss of their, you know, almost the

18  entirety of their retirement funds has impacted their lives.

19  However --

20          THE COURT:  And some of them are sitting here and

21  they're thinking why, probably.

22          MS. O'BOYLE:  Yes, Your Honor.

23          THE COURT:  But obviously that's the kind of thing

24  that comes up for sentencing.

25          MS. O'BOYLE:  Yes, Your Honor.  We don't, as we --

1          THE COURT:  If you get to that point.

2          MS. O'BOYLE:  Exactly.  And as we read the cases,

3    there is some concern that courts have that we're inflaming the

4    passions of the jury by eliciting that type of testimony.  The

5    government believes that it has an excellent case and that it's

6    going to stick to the factual evidence that it has in its

7    arsenal.  However, but like the government said in its motion,

8    if on cross-examination defense counsel through questions, you

9    know, opens doors, then I think that's a slightly different

10   matter.  However, the government on direct examination does not

11   intend to go into how the loss of all the their retirement funds

12   has impacted their lives, if they have lost homes, if it's

13   created marital disruption, if they have had to continue to look

14   for work, you know, well into their 70s because they didn't

15   expect not to have this money to live on.

16          THE COURT:  Okay.  So the main dispute appears to be

17   about what evidence should be permitted on the victim's actual

18   losses, and therefore I probably need to hear a little bit more

19   about that.  I'm unclear about the precise nature of the

20   defendant's request regarding the cumulative amount of all

21   victims' actual losses and of the victims' vulnerability and may

22   need some clarification on that.  But let me ask some questions.

23          In the government's brief it mentions that evidence of

24   actual loss might be relevant for proving materiality.  And you

25   cite U.S. v. Rand in which the Court declined to strike a

statement from an indictment as surplusage regarding the

victim's actual loss on the ground that they were probative of

the materiality of the fraudulent statement.  A motion to strike

surplusage has a different standard than Rule 403 because the

statement must be both irrelevant and prejudicial in order to be

stricken.  The standard for a motion to strike surplusage does

not require a court to weigh the probative value of relevant

evidence against the risk of unfair prejudice.  There's a case,

SEC v. Goldstone from 2016 in New Mexico where the court held

that evidence of actual loss had little relative probative value

compared to witness testimony pertaining to materiality, and

therefore the danger of an emotional response from the jury to

the amount of money lost from the victim's retirement savings

outweighed the minimal probative value.  And we're talking about

materiality here, not intent.

       MS. O'BOYLE:  Yes, Your Honor.

       THE COURT:  The Court's concern is similar to the

Goldstone court, as the government will likely have other

evidence regarding materiality.  And I was wondering if you want

to elaborate on your reasoning for why the evidence is you think

admissible for that purpose.

       MS. O'BOYLE:  Well, Your Honor, I think materiality,

the government has to prove materiality, and it's an objective,

as the Court knows, it's an objective standard.  And so for the

victims in this case who have suffered actual losses, losses to

1    their retirement funds, I think when this defendant conceals

2    that he intends to take 60 percent of their money straight off

3    the top, that he intends to steal that straight off the top for

4    his own personal purposes and that money would never actually

5    make it to the investment, suffering those kind of losses I

6    think goes directly to the materiality of the, their decision in

7    terms of, could they have sustained those losses.  People are a

8    lot more careful with their retirement funds than they're going

9    to be with maybe, you know, some, a little extra slush fund that

10   they have when they're 20.

11          THE COURT:  So what are we trying to get at with

12   materiality versus intent?

13          MS. O'BOYLE:  With materiality, it guess to the

14   importance of the monies to the particular person.  In

15   connection with these types of funds, the actual loss of these

16   kinds of fund which the defendant well knows is going to be a

17   lot more material, a lot more important to these particular

18   victims than just, you know, monies that are, again, just an

19   extra slush fund that people might have lying around.  These are

20   monies that people have worked their entire lives to save.  So

21   losses in connection with those types of funds are more

22   important to individuals, objectively, I think, because it's an

23   objective standard, that they're going to be a lot more careful

24   of those investments then they are with other types of monies.

25          THE COURT:  And therefore?

```
 1              MS. O'BOYLE:  And therefore it is the evidence that
 2   they have suffered losses to that effect proves that, you know,
 3   the materiality of the concealment, the fraudulent statements,
 4   particularly when in this particular case we have several, you
 5   know, different investments.  In one investment it was called
 6   Dental Support Plus franchise.  The defendant was well aware
 7   that in 2014 every person that he put in this investment lost
 8   all of their money to the total of three million dollars.  And
 9   he also then continued to present and sell investments that were
10   originated by the exact same person that created, that created
11   that investment.  And so we would offer, certainly offer those
12   losses to demonstrate that an individual, a victim, is -- that
13   those types of losses would be -- that the statements related to
14   that type of investment would be material.
15              THE COURT:  But that's, it's actual -- the actual
16   loss -- well, I guess...
17              MS. O'BOYLE:  It goes to both intent and materiality.
18              THE COURT:  Obviously intent.  Intent is the
19   easiest --
20              MS. O'BOYLE:  It is.  It is.
21              THE COURT:  -- case to make.  It just caught the eye
22   when the materiality argument was made.
23              MS. O'BOYLE:  Yeah.  I think materiality goes to the
24   point that we're not just talking about, you know, any old funds
25   that are lying around.  I think people, when you have a
```

1  defendant that's concealing his true intent what he intends to

2  do with the money, the fact that he's concealing his ownership

3  of companies behind shell corporations such as the investors

4  didn't even know they were handing up their money to him.

5          THE COURT:  But it's still your money.  The

6  misrepresentation -- I mean, whether it's for one purpose or

7  another, it's still loss of your own money.

8          MS. O'BOYLE:  I agree with you.  And I don't take the

9  loss of regular funds lightly.  But I think for these

10  individuals who have saved up their entire lives, saved up a

11  nest egg for their entire lives, they're an awful lot more

12  careful where they're putting their retirement funds.

13          THE COURT:  And therefore you're saying the

14  misrepresentation has to be of a different nature because of the

15  care with which they will watch those funds and that makes what

16  material?  It makes what more likely?

17          MS. O'BOYLE:  I think the fact that this defendant

18  lied and concealed that he was planning on stealing 60 percent

19  of the monies in one instance straight off the top, you know,

20  had he informed these people of the true nature of his intent,

21  they never would have entrusted their retirement funds with him.

22          THE COURT:  Okay.  Do you intend to mention the

23  victims' cumulative loss at trial?

24          MS. O'BOYLE:  Yes, Your Honor.

25          THE COURT:  For what purpose?

```
1              MS. O'BOYLE:  Again, to prove, to prove intent.  And
2    talking again about the DSPF group, the DSPF example, that
3    happened in 2014, and the defendant was well aware that those
4    losses were sustained.  The defendant continued to engage in
5    schemes related to products, that relate to the same
6    co-conspirator, knowing that that particular investment was
7    completely fraudulent.
8              And then in addition to that, the indictment alleges
9    in connection with both PLI Group Investment as well as the We
10   Monitor investment, there was lulling of these investors well
11   after their, the entirety of their funds were lost.  And so the
12   scheme goes through him actually informing three years after one
13   investment was completely kaput, he maintains lulling for three
14   years, and then within 2016 finally tells them that the
15   investment has failed.  And so the amount of money that is at
16   issue here is he's actually -- he lies to the victims and claims
17   that all the monies were invested in the actual investment when
18   in reality he had stolen in one instance over a million dollars
19   for himself.  So the actual cumulative losses are intertwined
20   with the facts of this case because he continued the scheme even
21   after the losses were sustained and never told the investors to
22   begin with.
23             THE COURT:  So the cumulative loss resulted from the
24   coverup, you're saying?
25             MS. O'BOYLE:  Yes, Your Honor.  Both -- yes.
```

1          THE COURT:  Isn't it -- if I allow victims' actual

2   loss to prove fraudulent intent, it's just a matter of addition

3   to add up actual loss?

4          MS. O'BOYLE:  It would be, but Your Honor, we don't

5   intend to call every single victim at trial.  He's got over 300

6   victims across the country.  And so we do not intend to present,

7   to present victims, all of those victims here or we would be

8   here for another -- not seven weeks, but we would be here for

9   seven months.

10          THE COURT:  So the probative nature of divulging

11   cumulative loss to the jury in deciding guilty or not guilty

12   beyond a reasonable doubt is what?

13          MS. O'BOYLE:  It's highly relevant evidence of intent,

14   Your Honor.

15          THE COURT:  Because?

16          MS. O'BOYLE:  It's, as the cases that have kind of

17   outlined this, you know, proof that as in the Copple case, proof

18   that someone was victimized by the fraud is evidence of intent.

19   The fact that people suffered losses and he did not take any

20   steps to remedy that, he just...

21          THE COURT:  We're talking about the cumulative amount.

22          MS. O'BOYLE:  Yes.

23          THE COURT:  This is an amount figure you want to offer

24   up?

25          MS. O'BOYLE:  Yes, Your Honor.  I think, I think --

1    again, I think it's the facts -- it's hard to do in this context

2    because the facts of the case I think will -- I think the

3    context of the trial will kind of go to explain even further the

4    probative value.

5              THE COURT:  Well, I've got to rule.

6              MS. O'BOYLE:  Yes, Your Honor.  And I think in this

7    context, particularly in the DSPF Group context, his victims

8    lost over three million dollars in that particular context, and

9    he was well aware of that fact, and then he continued right

10   along to sell investments related to the same co-conspirator --

11             THE COURT:  Okay.  So --

12             MS. O'BOYLE:  -- connected with that fraud.

13             THE COURT:  -- are you arguing that it makes it more

14   likely that he engaged in fraud when he knew how much money had

15   already been lost, and that one would normally, in the face of

16   that much money, have taken greater care in any representations

17   made, and that the failure to make such careful representations

18   and divulge information in the face of this large loss is a fact

19   that makes guilt of fraud and fraudulent intent greater?  Is

20   that your argument?

21             MS. O'BOYLE:  Yes, Your Honor.  Yes.

22             THE COURT:  All right.  So why don't I hear from

23   Mr. Wandner on these first two issues.

24             MR. WANDNER:  Mr. Broccoletti will be handling this.

25             MR. BROCCOLETTI:  The B Team, Judge.

```
1          THE COURT:  Okay.  So I don't know if you want to say
2    anything on the materiality issue first and then move on to the
3    cumulative loss; that is, you know, we have multiple categories.
4    Again, we first talk about the victims' actual loss, and you
5    know, it's one thing to talk about admitting evidence to show
6    fraudulent intent to prove that fraudulent intent, it's another
7    thing to argue that it's admissible for purposes of materiality
8    and maybe comes in for one, it doesn't matter so much.  You
9    know, we have to sort all that out.  But it just struck me on
10   the materiality, I wanted to understand what the basis was for
11   that.
12          MR. BROCCOLETTI:  Well, Your Honor, we set forth in
13   our brief, and the Court is well aware of what the statute
14   requires in terms of elements of the offense in terms of both
15   the mail fraud and the wire fraud, and our brief suggests, and I
16   think the case law also suggests that these issues that we're
17   addressing today are not elements of the offense.  Clearly
18   they're not elements of the offense, whether or not they're
19   probative of any of those elements of the offense.  And then the
20   court has to do that 403/404 balancing test about whether or not
21   that probative value is outweighed by the prejudicial value and
22   whether or not the government can obtain the same result that
23   they seek to obtain through other means which would not incur
24   the same prejudice to the defendant, which would engender the
25   sympathy and compassion of the jury towards the victims in the
```

1    case.

2           One thing I would like to point out, Your Honor, I

3    think that we've talked about collateral consequences, and the

4    Court and the government have conceded -- well, the government

5    has conceded the fact they're not going to get into collateral

6    consequences.  But if you start to get into the introduction of

7    evidence that these individuals invested all of their 401(k)s or

8    IRAs or whatever the circumstances may be, all of their

9    retirement funds, into these investments, and then we move into

10   the fact that they recovered zero of those funds, it does not

11   take a rocket scientist to figure out that loss occurs and they

12   therefore have no further retirement funds.  So while we're

13   saying that the government is not going to be introducing from

14   direct evidence any collateral consequences from what occurred

15   through their investments, they are.  Because once you start

16   down that road to say they're investing their retirement fund,

17   they have recovered none of this retirement fund, then they have

18   introduced evidence of collateral consequences.

19          THE COURT:  But it's different -- saying I lost

20   five million dollars is different than saying I lost the

21   entirety of my retirement fund.  And so it seems to me your

22   concern should be more with I lost the entirety of my retirement

23   fund versus I lost five million dollars.

24          MR. BROCCOLETTI:  Well, I agree.  And that is my

25   concern.  But my concern goes farther in that the source of the

1    funds -- I don't see why we need to get in the source of funds.

2    I don't think that's relevant to any considerations.

3              THE COURT:  You mean, to say it's a retirement fund?

4              MR. BROCCOLETTI:  Correct.  I think that they can say

5    that they invested X amount of dollars, but we don't need to get

6    into the source of where that came from.  Because that then gets

7    to the collateral consequences.  Again, it doesn't take -- I'm

8    sure the jury's going to be able to figure out, you've invested

9    five million of your retirement, you've recovered nothing of

10   that, that's a significant impact upon the balance of your life

11   and how you're going to be able to live.

12             THE COURT:  So we're putting a -- the issue here is we

13   have to put a very fine point on what the evidence is and is

14   not.  So when Ms. O'Boyle steps back up I guess I'll ask, are

15   you asking, are you saying you want to say five million dollars,

16   or do you want to say five million dollars in retirement funds?

17   That's the fine point you're putting on it.

18             MR. BROCCOLETTI:  Well, I think it is, Your Honor.

19   Because I think that that's, again, what the motion *in limine* is

20   directed at, and that's the prejudice that will enure to the

21   defendant as a result of introduction of that evidence and the

22   sympathy and compassion that the jurors would have for the

23   investors as they testified.

24             THE COURT:  Okay.  So that's the first one.

25             But it's still, I guess, even to the extent that it

1  comes in to prove intent, you're still concerned about the way

2  that it comes in, in other words?

3            MR. BROCCOLETTI:  Yes sir.  That's correct.

4            THE COURT:  I gotcha.  Okay.  And on the cumulative

5  loss issue did you want, do you want to address that further?

6            MR. BROCCOLETTI:  Well, I think that's also part and

7  parcel of what we argued in terms of the prejudice aspect of it.

8  I don't see -- if you've -- the elements of the offense are set

9  forth.  And again, I think that it's clear that as the Copple

10  case points out that the Fourth Circuit's developed a liberal

11  policy to allow the government to introduce evidence regarding

12  losses that are peripherally bearing on the question of intent.

13  So I guess the Court has to make that determination about how

14  far you go in that peripheral determination and how far you

15  allow the government to go in making that peripheral

16  determination to offer evidence that losses occurred are

17  sufficient to be able to establish, I think, the elements or

18  what the government intends to introduce and to be able to

19  establish the intent of the defendant as they may claim it.

20            I think that the Court also -- I'm sure you're

21  familiar with some of the background of the case -- clearly

22  you're not as familiar as the lawyers are in terms of what the

23  investments are -- but these are venture capital undertaking.

24  It's not that you're investing in AT&T, IBM, before the other

25  day I would have said FaceBook, but in those sorts of

```
 1   investments.  You're talking about speculative, high-risk
 2   investments, which are inherently risky.  In fact, when the
 3   Court will see through the course of the evidence the investment
 4   offerings, the placement memorandums, all of the funding
 5   agreements, all of the contracts signed between the investors
 6   and the defendant, it is a major fact of disclosure that these
 7   are high-risk investments.  So when one enters into that
 8   agreement, one enters in knowing that the substantial risk of
 9   loss is present.  So again, I think that you have to take that
10   into consideration when you understand what this aggregate
11   amount of loss that the government seeks to introduce against
12   that particular background.  The investors went into this
13   knowing that they could lose everything because of the venture
14   capital nature and the high-risk investment it's associated
15   with.  So therefore the introduction of the amount of loss, I'd
16   suggest to the Court is not relevant to the extent that it
17   overwhelms or outweighs the prejudice aspect of it in terms of
18   what the amount should be.  If the jury hears 20 million
19   dollars, 30 million dollars, 10 million dollars, whatever that
20   may be, it's going to be an eyeopener, and I think that's going
21   to distract them from what the issues in the case will be in
22   terms of the elements of the offense that have been presented
23   when they get their particular instructions.
24           THE COURT:  I guess one thing that I'm struggling with
25   is how -- why isn't this a case where it's inherently
```

```
1  prejudicial because it goes to the scope of the crimes?  That
2  is, the cumulative amount?  It's inherently prejudicial because
3  it goes to the scope of the crime.  You can't get away from
4  that, but that doesn't necessarily make it unduly prejudicial.
5  And that's what I'm struggling with.  Why isn't the government
6  entitled to present evidence of the scope of the crimes to the
7  jury?  Because you know, the scope of it, if you follow the
8  trail backwards, says something about intent, care, precautions.
9  And you've said, you know, we're going to present a lot of
10 evidence to the jury that warnings were given, that this is
11 speculative, it's venture capital, it's very risky, et cetera.
12 But why isn't the government entitled to -- and you're right, I
13 know nothing more than what's in the indictment and what I've,
14 the little bit that I've read with respect to the bond matter.
15 But why isn't it that you can present the scope and then there
16 are inferences with respect to probative value on some of the
17 elements?  That's my problem.
18          MR. BROCCOLETTI:  Well, I think that the government
19 would be able to introduce the scope of the issues without
20 having to get into the aggregate amount of monies or losses that
21 are involved.
22          THE COURT:  How?
23          MR. BROCCOLETTI:  Well, Ms. O'Boyle already talked
24 about the numbers of victims or the number of investors.  We'll
25 be talking about multiple different investments.  We'll be
```

```
 1   talking about multiple different deals.  We'll be talking about
 2   the types of deals that they were and the types of investments
 3   and the types of companies and corporations and startup capital,
 4   things of that particular nature.  So all of those, that scope
 5   I'd suggest to the Court, is going to be able to be addressed in
 6   a balancing act that the Court, I think, has to engage in under
 7   the federal rules to make that determination.  So that evidence
 8   and that scope will be, I think, apparent to the jury through
 9   the evidence that's going to be presented absent the aggregate
10   amount of losses.
11              THE COURT:  All right.  Thank you.
12              MR. BROCCOLETTI:  Thank you, sir.
13              THE COURT:  Ms. O'Boyle, let's move on.  Emotional and
14   personal hardship occasioned by the victims' losses.  You have
15   said that you don't intend to offer collateral consequence
16   evidence, right?
17              MS. O'BOYLE:  Yes, Your Honor.
18              THE COURT:  And so I don't think we really need to --
19   you're conceding sort of that issue?
20              MS. O'BOYLE:  There's, there's --
21              THE COURT:  The defendant wanted to be careful about
22   it, raise it, and make sure you weren't going to, weren't
23   planning to try to go there, and you're not planning to.
24              MS. O'BOYLE:  I completely understand.  I've spoken
25   with many of these victims.  Stories are awful.  So I understand
```

1  his concern.  And the government doesn't intend to -- there is a

2  time and a place for that.  If he gets convicted, there's victim

3  impact testimony at sentencing where that kind of testimony is

4  highly relevant.

5          THE COURT:  Where you're less likely to cause

6  someone's ability to judge to be affected.

7          MS. O'BOYLE:  Yes, Your Honor.

8          THE COURT:  Yeah.

9          So let's see, victim's vulnerability.  They have

10  argued that it's unduly prejudicial and not probative to put on

11  evidence of the victim's vulnerability.  You've said that you're

12  unclear about what the defendant is objecting to.  Do you intend

13  to highlight the victims' vulnerability, and if you do, for what

14  purpose?

15          MS. O'BOYLE:  Well, I don't intend -- I'm, I'm still a

16  little confused about what he's talking about there.  The fact

17  that he's trying to say that -- trying to prevent the government

18  from allowing the victims to say that these were for retirement

19  funds when this defendant targeted that particular group of

20  people for this specific crime, he had advertisements, you know,

21  in his weekly radio show.  He advertised on the radio both down

22  here in Virginia and in Florida targeting people with retirement

23  accounts.

24          THE COURT:  How so?  Tell me what was said.

25          MS. O'BOYLE:  The advertisements talk about, you know,

```
 1   your IRA is growing -- I didn't bring my notes related to the

 2   ads.  But they talk about, you know, wanting to -- they have

 3   Social Security maximization seminars; that he sends out

 4   mailings and has radio ads inviting seniors to a free meal where

 5   they sit down and they talk about maximizing their Social

 6   Security.

 7             THE COURT:  They used the word "seniors"?

 8             MS. O'BOYLE:  They used Social Security maximization

 9   seminars, Your Honor.  And the individuals that are going to

10   those are people that are close to retirement.  On his weekly

11   radio show he had a whole segment about fraud on, you know,

12   scams on seniors.  And he even represents in the radio show

13   that, you know, a lot of our clients are elderly, a lot of our

14   clients are retirees.  So he knows very well who he's targeting

15   with these venture capital investments.  And so the idea that we

16   somehow have to present the testimony without having the victims

17   explain to the jury that these were their retirement funds that

18   he had them move from a legitimate 401(k) and IRA with a legit

19   broker to a self-directed IRA account at a trust company that he

20   then directed them where to place those funds, it's intrinsic to

21   the scheme, Your Honor.  There's really -- I mean, I'm not even

22   sure how we would go about trying the case without explaining

23   where these individuals got these huge chunks of money.  So it's

24   highly probative.  I mean, the government's not going to get

25   into, I mean, any maladies that the person has or -- I guess
```

1   that's the confusion for me, is what vulnerabilities he's

2   concerned about?  You know, we intend to call the victims to

3   testify.  I believe at least one of them -- I know at least one

4   of them has eyesight problems, but I think that's going to be

5   kind of apparent from the, from -- the government can't cover

6   that up.  Some of them may need aids, you know, the little

7   headphones to be able to hear a little bit better.  But the

8   government doesn't intend to, beyond calling them and having

9   them present their testimony, being able to tell, you know, how,

10  how they came in to hire Mr. Bank as their financial adviser and

11  end up with these investments.

12          THE COURT:  Okay.  Let me hear from defense counsel.

13          Thank you.

14          MR. BROCCOLETTI:  Excuse me for one second, Your

15  Honor, I'm sorry.

16          (Defense counsel conferred.)

17          MR. BROCCOLETTI:  Yes, sir.

18          THE COURT:  Okay.  So what does the defendant envision

19  a ruling on this issue encompassing?  There's a lock of clarity

20  on that.

21          MR. BROCCOLETTI:  The vulnerability.  Is that what the

22  Court's talking about?

23          THE COURT:  Yes.  But so, I guess this kind of takes

24  us back a bit, even.  If the defendant was advertising in a

25  particular way, that seems to have a relevance that I understand

1   your argument there's a two-edged sword there that there could

2   be a down side to it.  But why doesn't it help the jury to

3   understand intent, at the very least, when someone is going

4   after a certain clientele?

5          MR. BROCCOLETTI:  Well, I think that's where we

6   diverge and disagree.  I think the evidence that the Court will

7   hear will be that the defendant and his salesmen, primarily

8   salesmen, advertised to a wide group of people for investments.

9   Young, old, in between, all classes, all forums.  And so I don't

10  think that the evidence is going to particularly demonstrate

11  that he targeted the one class of individuals that the Court is

12  indicating in terms of seniors.  I think Social Security

13  Maximization doesn't necessarily refer to the targeting of

14  someone's that's on Social Security as it does how to be able to

15  focus and obtain the most out of whatever Social Security

16  benefits you can get by retiring at a particular age.  We all

17  get these letters from Social Security saying if you retire at

18  this age you get this amount, if you retire at that age you get

19  X amount, things of that nature.  So educational seminars, if

20  you will, with respect to that.  But I think that the evidence

21  will show that a wide class of individuals were advertised or

22  subject to advertisements on this particular subject.

23         THE COURT:  And so your argument is that if the

24  reality was that there was $100,000 of advertising money, for

25  example, and it was being proportionately spent over the

 1   demographics of age 30 to age 80, that for the government to

 2   come in and only -- to not reflect that disproportionately,

 3   suggests to the jury, that the defendant's advertising was at

 4   those people in the 70 and 80 range, that it would be

 5   prejudicial to the defendant and in and of itself create

 6   sympathy that might cause a jury to convict where it shouldn't

 7   or wouldn't otherwise?

 8              MR. BROCCOLETTI:  Yes, sir.  That's correct.  And I

 9   think that obviously if they introduce one side of the coin,

10   we're going to be introducing the other side of the coin to make

11   a balance.

12              THE COURT:  Well, let's say that part of the -- you

13   know, let's say there was a scheme and the scheme included we're

14   going to kind of get people in this demographic in this way and

15   we're going to get people in this demographic in this way and

16   we're going to get people in this demographic in this way.  If

17   the government chooses to put on evidence from a particular

18   demographic, they're not the only demographic, it's still

19   probative, isn't it?  It's still probative of how the fraud,

20   alleged fraud was conducted --

21              MR. BROCCOLETTI:  No, I would --

22              THE COURT:  -- or took place.

23              MR. BROCCOLETTI:  Respectfully I would disagree with

24   that.  The demographics of the investors is not probative of the

25   scheme to defraud.  A scheme to defraud is based upon

1   misrepresentations, omissions, the classic issues that we see

2   before the court.  And so those misrepresentations and those

3   omissions can be directed at any segment of the society, any

4   group of individuals.

5        THE COURT:  So you don't see the -- you see it as, if

6   you target somebody who is in their 70s or 80s they may be an

7   easier target than others?

8        MR. BROCCOLETTI:  No, I can understand that argument.

9   And that would be true if the defendant -- and just for the sake

10  of discussion today -- if the defendant and his company targeted

11  just those individuals.  But I don't think that's the evidence.

12  I think that the evidence would show that a number of investors

13  overall -- wrong word to use.  Overall groups of investors and

14  all segments of society lost money, not just this one group.

15  And if there were a scheme directed solely at the elderly and

16  infirm and vulnerable and that was the extent of it, then I

17  think that the government's argument would be much more

18  compelling.

19       THE COURT:  So what do you want me to rule?  What do

20  you want me to say?

21       MR. BROCCOLETTI:  In a perfect world?

22       THE COURT:  I just, I want to be, I want to make sure

23  I understand what you want me to do.  What you're asking me to

24  do.

25       MR. BROCCOLETTI:  Well, I think what we've asked the

1   Court to do is to, in terms of the aspect of source of the

2   funds, funds were invested.  I don't think we need to get into

3   the source of the funds.  Because the source of the funds then

4   leads to where, where the money came from, and I just don't see

5   how that's an element or probative of the offense.

6           THE COURT:  Okay.  Thank you.

7           MR. BROCCOLETTI:  Yes, sir.  Thank you.

8           THE COURT:  So let's start with the legal standard.

9   Although the Federal Rules don't explicitly authorize *in limine*

10  proceedings, obviously the practice has developed pursuant to

11  the district court's inherent authority to manage the course of

12  trials.  That's what the Supreme Court recognized in Luce.  The

13  purpose of a motion *in limine* is to permit the trial court to

14  rule in advance of trial on the relevance of certain forecasted

15  evidence as to issues that are definitely set for trial without

16  lengthy argument at or interruption of the trial itself.  And

17  these motions serve an important gatekeeping function by

18  allowing a trial judge to eliminate from consideration evidence

19  that should not be presented to the jury.

20          Motion*s in limine* to exclude evidence should be

21  granted only when the evidence is clearly inadmissible on all

22  potential grounds, as Judge Cacheris noted in his opinion in

23  Verges in 2014.  The principle applies because a court is almost

24  always better situated during the actual trial to assess the

25  value and utility of evidence.  In general, motions *in limine*

1   seeking exclusion of broad categories of evidence are

2   disfavored, as the Sixth Circuit noted in Sperberg v. Goodyear

3   Tire in 1975.

4           A Court's ruling regarding a motion *in limine* is

5   subject to change when the case unfolds, particularly if the

6   actual testimony differs from what was expected, as the Supreme

7   Court noted in Luce.

8           A Court considering a motion *in limine* may also

9   reserve judgment until trial so the court -- so that the motion

10  is placed in the appropriate factual context.

11          Evidence generally is relevant if it has any tendency

12  to make a fact more or less probable than it would be without

13  the evidence and the fact is of consequence in determining the

14  action.  However, relevant evidence may still be excluded if its

15  probative value is substantially outweighed by a danger of

16  unfair prejudice under Rule 403.  Evidence is unfairly

17  prejudicial when there is a genuine risk that the emotions of a

18  jury will be excited to irrational behavior and this risk is

19  disproportionate to the probative value of the offered evidence.

20          The briefs discuss whether the evidence at issue here

21  is relevant for purposes of proving mail and wire fraud.  To

22  convict a person of mail or wire fraud, the government must show

23  that the defendant devised or intended to devise a scheme to

24  defraud, two, used interstate mail or wire communications in

25  furtherance of the scheme, and three, the statements or

1    omissions in the mail or wire communications were material to

2    the scheme, and four, defendant acted with the specific intent

3    to defraud.

4         So turning first to the actual loss issue and

5    defendant's request that evidence of the victims' actual loss be

6    excluded.  Defendant is correct that proof of actual loss is not

7    an element of mail or wire fraud.  This, however, doesn't mean

8    that evidence of actual loss is irrelevant.  As the Third

9    Circuit noted in US v. Copple in 19194.  "While proof of actual

10   loss by the intended victim is not necessary in a fraud case,

11   proving specific intent in fraud cases is difficult, and as a

12   result, a liberal policy is developed to allow the government to

13   introduce evidence that even peripherally bears on the question

14   of intent.  Proof that someone was victimized by the fraud is

15   thus treated as some evidence of the schemer's intent.

16        The same rationale for permitting the introduction of

17   evidence of the victim's actual losses in fraud cases in order

18   to prove a specific intent to defraud has been endorsed in two

19   unpublished opinions by the Fourth Circuit as well as numerous

20   other courts.  In U.S. v. Noel at 502 F. App'x 284, 2012, the

21   Fourth Circuit noted that the testimony about the victim's

22   financial losses was relevant to prove intent to defraud, citing

23   Copple.  And in Zehrback, 98 F. App'x 211, Fourth Circuit 2004,

24   citing Copple they noted, our Circuit did, "In a mail fraud

25   prosecution, evidence that the victim suffered losses and the

1   defendant refused to make good those losses is relevant to show

2   the defendant's specific intent to defraud."

3          The Sixth Circuit in Sutherlin, 118 F. App'x, held

4   that in a trial for various frauds, including mail fraud, the

5   government was entitled to introduce proof of investor loss to

6   prove the defendant's specific intent to defraud, and numerous

7   other courts have so held.

8          The Court therefore considers the example of the

9   Copple court to be instructive and finds that evidence of the

10  victims' losses is relevant for purposes of proving specific

11  intent to defraud.

12         The Court has also weighed the probative value of this

13  evidence against the dangers of unfair prejudice and finds that

14  the probative value is not substantially outweighed by the risk

15  of unfair prejudice.

16         Of course the defendant may respond with explanatory

17  evidence if he wishes to do so, but of course a defendant never

18  has to put on any evidence, it's always the government's burden

19  of proof beyond a reasonable doubt whether the defendant

20  cross-examines a witness or puts on any evidence.  And the Court

21  still has to make that prejudice/probativeness determination,

22  and it seems to me that actual losses are probative.

23         Now we may get to trial and there may be some unique

24  circumstance that you want to call to my attention, but as best

25  I can in March with a September trial, that's the best I can do

for you at this point in giving you some guidance.  I've already

considered the probative value of evidence of the victims'

actual loss for the purpose of demonstrating materiality.  I

find that evidence of actual loss has limited probative value on

materiality in view of the other evidence the government will

likely present on that issue, because there is some risk that

testimony regarding actual loss may be emotional and evoke

sympathy from the jury.  I find that the probative value of

evidence of actual loss for purposes of showing materiality

versus intent is substantially outweighed by the risk of unfair

prejudice and therefore is not admissible for that purpose.

On the victims' actual -- or excuse me, cumulative

losses and the argument that it would be unfairly prejudicial.

Because I'm going to permit in broad terms evidence of actual

loss, it's common sense that the cumulative total of such losses

is admissible.  As I alluded to earlier, the jury is naturally

caping of doing simple math, and they can easily add the

individual victims' losses together and find the sum.  The

government has represented they may not present all those

victims.

As to the argument that the probative value of the

total loss figure is outweighed by the risk of unfair prejudice,

I agree that the evidence has some prejudicial effect for

defendant, but not necessarily unfair prejudicial effect.  While

I'm unaware of other courts that have ruled exactly on this

1    issue, numerous courts have denied motions to strike surplusage

2    regarding total alleged loss amounts in fraud cases where a

3    defendant argued that such totals were irrelevant and unfairly

4    prejudicial, such as in the Daugherty case this past year in the

5    Eastern District of Kentucky, declining to strike a reference

6    that a fraud scheme had a potential loss amount to exceed

7    $600 million because the total was relevant to the alleged

8    conspiracy's actual scope, and also because it was not unduly

9    prejudicial.  The Beasley decision from the Eastern District of

10   Michigan in 2014 declining to strike a reference to losses of a

11   least 84.18 million from Investments Associated with the scheme

12   to defraud because the total loss was relevant to the

13   government's theory of the case.  U.S. v. Hampton from Arkansas,

14   2006, Eastern District, declining to strike a reference to a tax

15   loss of more than $150,000 because it was not unduly prejudicial

16   and was relevant in that it states the scope of the crimes

17   charged.  The Gotti opinion from 2004, Southern District of New

18   York, declining to strike an allegation that the conspiracy

19   involved a loss of more than 5 million because evidence that

20   5 million was obtained was relevant to an element of extortion

21   in rejecting an argument that the government was seeking to

22   quantify the amount instead of proving merely that some

23   unspecified property was obtained rendered the evidence

24   irrelevant or overly prejudicial.

25           Similarly, though a different standard applies, the

1   Court concludes that the total loss figure here is relevant for

2   showing the scope of the crimes charged and is not unfairly

3   prejudicial to the defendant, and will not be excluded.  That's

4   even the case if everyone isn't called to testify such that the

5   figures add up to the total amount, I'll still allow evidence of

6   that cumulative figure.  And I'll consider whether something

7   becomes in some unique way particularly prejudicial when we get

8   to trial.  We're a long way out.

9           Now, on this issue of emotional and personal hardship

10  or collateral consequences occasioned by the victims' losses,

11  the Court notes that the government has represented that it has

12  no intention of offering this type of evidence in the case.  The

13  Court agrees with the parties that evidence of the devastating

14  collateral or emotional and personal consequences occasioned by

15  the victims' actual losses would have little probative value and

16  would primarily serve to highlight the victims' personal

17  tragedy.  That testimony would appear to be designed or have the

18  effect of generating feelings of sympathy for the victims and

19  would create a risk that the jury would be swayed to convict

20  Mr. Bank as a way of compensating these victims and potentially

21  have them be blinded to evidence that would not lead to a

22  conviction.

23          Many other courts have reached the same conclusion

24  regarding these types of victim impact evidence, such as the

25  Cruz court at 601 F. App'x at Page 632, noting that the court

94

1   believed that the district court abused its discretion by

2   admitting victim impact evidence in a fraud case.

3            Sokolow, Third Circuit 1996, holding that evidence of

4   victim's collateral consequence has little if any probative

5   value and may be unfairly prejudicial.  And of course Copple,

6   finding the district court abused its discretion by allowing

7   victim impact testimony in a mail fraud case beyond anything

8   that was reasonable to prove Copple, Mr. Copple's specific

9   intent to defraud.

10            So the Court finds that evidence of the victim's

11   collateral consequences or emotional and personal hardships

12   related to their actual losses must be excluded under Rule 403.

13            Now, on the victim's vulnerability, as to this issue

14   concerning evidence that the victims' are vulnerable, the

15   government has represented that it does not intend to show that

16   the defendant specifically targeted retirees, as I understand

17   it, but the government does indicate that it wishes to offer

18   evidence that the defendant advertised in a certain way on

19   certain shows and that it does intend to show that it has the

20   effect of targeting a certain demographic, almost all of whom

21   were unsophisticated investors or had some vulnerability in

22   order to show a specific intent to defraud and materiality.

23            Evidence showing that the defendant intentionally

24   targeted unsophisticated investors has some probative value for

25   both of the purposes for which the government intends to offer

1  it.  In weighing the risk, such evidence would be unfairly

2  prejudicial as the defendant contends, against the probative

3  value of such evidence.  The Court finds that the probative

4  value is not substantially outweighed by the risk of unfair

5  prejudice.  I also note that even if it were, if I were to rule

6  that evidence of the victims' vulnerability may not be

7  highlighted by the government, it would be impossible to prevent

8  the jury from naturally inferring from the victims' own

9  testimony that they may have some particular vulnerabilities to

10  fraud.  That being said, I will keep an ear out and an eye out

11  to efforts at exacerbating or unduly playing on the emotions of

12  the jury with respect to vulnerability.  That's a fine line to

13  draw when the manner of the conduct of a fraud may be

14  inextricably intertwined with the vulnerability.  And so it's a

15  line that will have to be drawn in the proceedings once the

16  Court has a better feel for it all.  But I think it's going to

17  be difficult because of them being intertwined.

18       So I find that evidence concerning the victim's

19  vulnerability is to some extent admissible for purposes of

20  showing intent to defraud and materiality of any fraudulent

21  statements.

22       And I think that that has addressed all of the grounds

23  of the motion *in limine*, if I understand it.

24       The motion to reconsider, Ms. Yusi, I think you were

25  the one that wrote that?  My view is that I can deal with that

96

1    separately.  I don't need to have argument today on that.

2    There's no additional briefing necessary on that, is there?

3              MS. YUSI:  No, Your Honor.

4              THE COURT:  Is any additional briefing necessary on

5    that?

6              MR. BROCCOLETTI:  No, Your Honor.

7              THE COURT:  Then I will rule on that separately.

8              Is there any other way I can help you all?

9              MR. BROCCOLETTI:  Go ahead.

10             MS. O'BOYLE:  Not at this stage, Your Honor.

11             MR. BROCCOLETTI:  If I could, Judge?

12             THE COURT:  Yes.

13             MR. BROCCOLETTI:  Two things.  One -- and I don't like

14   to go backward, I always like to go forwards -- but if we could

15   get a ruling from the Court on the source of the funds that we

16   did argue today?

17             THE COURT:  Yeah.

18             MR. BROCCOLETTI:  And then secondly with respect to

19   the motion to be able to sell the home and to escrow the

20   proceeds, if the Court wants us to brief that, if the Court just

21   wants to issue an opinion as it's going to on the bond

22   modifications, that's fine as well.

23             THE COURT:  So let's deal with the source.  Whether

24   they came from retirement funds?

25             MR. BROCCOLETTI:  Yes, sir.

```
 1              THE COURT:  So I think that I just think it is, that
 2    is part of the concept of being inextricably intertwined.  And
 3    the probative value -- you know, if I understand -- it's been
 4    some time since I read the entire, read the indictment, and I --
 5    but it seems to me that the government's theme is that the
 6    defendant was looking to a particular demographic and looking to
 7    a particular demographic, and the way things are pitched to that
 8    demographic bears on the intent of the defendant in particular
 9    in light of the various risks involved with the investment and
10    people's insecurities or securities.  And frankly, frankly, if
11    your theory of the case is we divulged the risk, we told people
12    what the risk was, they knew how risky it was and how
13    speculative it was and that's the evidence you're going to
14    present as your theory of the case, it seems to me, frankly,
15    that there's two -- it's a two-edged sword; that is, that
16    someone who is investing retirement funds would be particularly
17    careful and would be hesitant to invest in a speculative
18    investment, and for a jury to know that fact actually may
19    benefit the defendant.  But irrespective of whether it benefits
20    the defendant or not, it also affects how the government
21    presents its case of the defendant's intent to defraud.  And I
22    just think it is sort of -- it's hard to pull it apart.  And you
23    know, if something unique comes up I'll hear about that at
24    trial.  But I think they're not to unduly dwell on it, and it's
25    not to -- getting in that it's coming from retirement funds is
```

1  not to spill over into I lost my entire retirement savings,

2  therefore in the jury's mind this person is out on the street or

3  whatever, or there's some, such that the jury's ability to have,

4  to look at the evidence in a dispassionate way and reach a just

5  and fair verdict is in some way clouded.  You know, I'm going to

6  be sensitive to that.  So we're not to get into that.  And your

7  witnesses need to be, you know, you need to explain to them that

8  you may get this, you may get out that it came from retirement

9  funds, but the way in which you do that I'll be sensitive to, to

10  balance this.

11        Now, the sale of the house and the escrow and the

12  bond, hold on a second.

13        (Court and law clerk conferred.)

14        THE COURT:  I don't feel like I need to hear any

15  additional argument.  But honestly, after this day and

16  everything that I've been through for the last seven weeks, I

17  just can't listen to any more.  I really can't.  So if you -- do

18  you all want to file anything any supplemental brief on that

19  issue?

20        MR. BROCCOLETTI:  I wasn't suggesting Your Honor that

21  you hear any more from the lawyers.  You've heard more than

22  enough from the lawyers.  I think that we've submitted enough to

23  you and we rely upon the submissions.

24        THE COURT:  You're comfortable with me ruling --

25        MR. BROCCOLETTI:  Yes, Your Honor.

1            THE COURT:  -- on what you submitted?

2            MR. HUDSON:  It has been fully briefed, Your Honor, in

3  the government's view.

4            THE COURT:  Okay.  We'll get to it.  I'm quite backed

5  up, as you can imagine.  And so we will get to it as soon as we

6  can.

7            All right.  Well, thank you all for your arguments.

8            MR. BROCCOLETTI:  Thank you, sir.

9            (Whereupon, proceedings concluded at 5:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    *CERTIFICATION*

2

3        *I certify that the foregoing is a true, complete and*

4  *correct transcript of the proceedings held in the above-entitled*

5  *matter.*

6

7        _____

8                Paul L. McManus, RMR, FCRR

9                    _____

10                        Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25