**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 2:17-cr-126** |
| | ) | |
| **DARYL G. BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## GOVERNMENT'S POSITION ON SENTENCING

The United States of America, by and through its attorneys, Raj Parekh, Acting United States Attorney for the Eastern District of Virginia, and Melissa E. O=Boyle, Elizabeth M. Yusi, and Andrew Bosse, Assistant United States Attorneys, offers the following with respect to the sentencing factors under both the United States Sentencing Guidelines and 18 U.S.C. § 3553(a). The government has no objections to the Pre-Sentence Report and advocates for a sentence of 35 years' incarceration.   The defendant's objections are addressed below, and if necessary, the government will call FBI Forensic Accountant Alain Martell and/or IRS-CI Special Agent Andrew Bowers to present additional evidence to support the sentencing enhancements in this case.   The government has submitted victim impact statements connected to this case and may have victims request the opportunity to address the Court prior to sentencing.   Pursuant to 18 U.S.C. § 3771, the government intends to give such victims an opportunity to be heard at the sentencing hearing.   In support of its position, the government states as follows:

I.      **Background Facts**

On August 23, 2017, a grand jury sitting in Norfolk returned an indictment against Daryl

G. Bank (Bank) and Raeann Gibson (Gibson) arising from their scheme to defraud hundreds of

investors across the country.    On May 25, 2018, a grand jury returned a second superseding

indictment against Bank, Gibson, and Bank's attorney Billy J. Seabolt.    ECF No. 105.    The

second superseding indictment charged Bank and his conspirators with conspiracy to commit

mail and wire fraud in violation of Title 18, United States Code, Section 1349; mail fraud in

violation of Title 18, United States Code, Section 1341; wire fraud in violation of Title 18,

United States Code, Section 1343; conspiracy to commit securities fraud, in violation of Title 18,

United States Code, Section 371; the sale of unregistered securities, in violation of Title 15,

United States Code, Section 77e and 77x; securities fraud in violation of Title 15, United States

Code, Section 77q and 77x; conspiracy to commit money laundering, in violation of Title 18,

United States Code, Section 1956(h); and engaging in unlawful monetary transactions in

violation of Title 18, United States Code, Section 1957.    The charges stemmed from a massive

five-year scheme to defraud investors – almost all of whom were at or near retirement age – of

millions of dollars.    The fifty-six page second superseding indictment provided substantial

details about this scheme, through which defendant successfully defrauded investors across the

country.    On March 29, 2021, the government filed a motion to dismiss count 8 of the

indictment, and the Court granted the motion.

Trial began on March 30, 2021, and spanned five full weeks. After listening attentively to

witness testimony, viewing exhibits and videos on courtroom screens, and hearing the arguments

of counsel, the jury convicted Bank of all remaining counts in the second superseding

2

indictment.    Specifically, the jury convicted Bank of conspiracy to commit mail and wire fraud, five counts of mail fraud, five counts of wire fraud, conspiracy to commit securities fraud, five counts of sale of unregistered securities, four counts of securities fraud, conspiracy to commit money laundering, and five counts of engaging in unlawful monetary transactions.    After trial, the Court remanded the defendant into the custody of the U.S. Marshals and scheduled sentencing for 10:00 a.m. on September 20, 2021.

## II.    Standards Governing Sentencing

In three separate opinions, the Supreme Court established the modern federal sentencing regime.    In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, but emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. *Id.* at 264.    The Supreme Court reaffirmed this principle in *United States v. Kimbrough*, 552 U.S. 85 (2007), emphasizing that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence."    *Id.* at 90. Finally, in *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court instructed that the sentencing court should calculate the sentencing guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors.    *Id.* at 49–51.    The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."

*Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").

Applying these standards, the Fourth Circuit has concluded that a sentencing court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence."   *United States v. Simmons*, No. 07-4888, 2008 WL 681764, at *1 (4th Cir. March 11, 2008) (citing *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)).

## III.   The Advisory Guideline Range Was Appropriately Calculated

The government has no objections to the Pre-Sentence Report and maintains that the appropriate advisory guideline range is life.   Defendant has objected to:   (1) paragraphs 107 and 115, which relate to the twenty-two-level increase for creating losses greater than $25,000,000; (2) paragraph 116, which relates to the six-level increase for causing a substantial financial hardship to 25 or more victims; and (3) the final sentence of paragraph 104, which relates to the two-level increase for obstruction of justice based, in part, on the allegation that Bank stole a hard drive from Ms. Gibson.

### A.   The Pre-Sentence Report

The probation office calculated defendant's advisory guideline range as life. Defendant's base offense level is 6 pursuant to U.S.S.G. § 2B1.1.   The probation office appropriately concluded that the following enhancements applied:

- A 22-level enhancement because the losses exceeded $25,000,000 (U.S.S.G. § 2B1.1(b)(1)(L));

- A 6-level enhancement because the offense resulted in substantial financial hardship to 25 or more victims (U.S.S.G. § 2B1.1(b)(2)(C));

- A 2-level enhancement because the offense involved a violation of any prior, specific judicial or administrative order, injunction, decree, or process (U.S.S.G. § 2B1.1(b)(9)(C));

- A 4-level enhancement because the offense involved a violation of a securities law and, at the time of the offense, the defendant was an investment advisor or a person associated with an investment adviser (U.S.S.G. § 2B1.1(b)(20)(A)(iii));

- A 2-level enhancement because the jury convicted the defendant under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B));

- A 4-level enhancement for being an organizer or leader of the criminal activity involving 5 or more participants (U.S.S.G. § 3B1.1(a)); and

- A 2-level enhancement for obstruction of justice (U.S.S.G. § 3C1.1).

The application of these enhancements results in an adjusted offense level of 48.    As a result, defendant's total offense level is 43 pursuant to Chapter 5, Part A, which provides that in those instances where an adjusted offense level exceeds 43, the total offense level will be treated as a level 43.    Defendant is in criminal history category I.    Accordingly, defendant's advisory guideline range is life.

## B.    Defendant's Objections Are Without Merit

### 1.    The Pre-Sentence Report Appropriately Applied An 22-Level Enhancement For Actual Loss

Defendant objects to the 22-level enhancement for losses exceeding $25,000,000. U.S.S.G. § 2B1.1(b)(1)(J).    The Court is well aware of the standards applicable to the loss calculation.    Pursuant to the guidelines, the court "need only make a reasonable estimate of the loss."    U.S.S.G. § 2B1.1, App. Note 3(C).    The guidelines further note that "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that

5

evidence." *Id.*   As a result, a sentencing judge's calculation of the loss is entitled to

"appropriate deference."   *See United States v. Allmendinger*, 706 F.3d 330, 341 (4th Cir. 2013)

("The determination of loss attributable to a fraud scheme is a factual issue for resolution by the

district court, and we review such a finding of fact only for clear error.").   Here, actual loss

means the "reasonably foreseeable pecuniary harm that resulted from the offense."   *Id.* at App.

Note 3(A)(i).   And, for purposes of this guideline, the reasonably foreseeable pecuniary harm

means "pecuniary harm that the defendant knew, or under the circumstances, reasonably should

have known, was a potential result of the offense."   *Id.* at App. Note 3(A)(iv).

The government has presented substantial evidence of the *actual losses* sustained by the

victims at trial, and those losses total more than $25 million.   At the trial, the government called

FBI Forensic Accountant Alain Martell.   He testified to the massive amount of losses that the

victims sustained in this case.   Specifically, the government entered into evidence Mr. Martell's

binders and other exhibits that documented the amount of funds that each individual victim

invested in Bank's fraudulent securities, what happened to those funds, and how much each

individual victim lost.   Gov. Exs. 250 (DSPF Group, LLC), 313 (Janus Spectrum Group, LLC),

409 (Prime Spectrum Group, LLC), 517 (Spectrum 100, LLC), 611 (Venture Capital, LLC), 624

(Excel Bandwidth, LLC), 625 (Excel Bandwidth II, LLC), 709 (PLI Group, LLC), 833

(weMonitor Group, LLC), 908 (Warped Cigar, LLC).   If necessary, the government intends to

call Mr. Martell to further substantiate the losses detailed in the Pre-Sentence Report, which are

detailed in paragraph 107.   The defendant has not explained, or come forward with evidence

showing, which of the losses detailed on pages 18 – 28 of the Pre-Sentence Report were

incorrectly calculated.   These losses were real, and they were sustained by real people across

this country.    The Report's inclusion of the 22-point enhancement is factually correct, and so the objection to the loss amount should be overruled.

### 2. The Pre-Sentence Report Appropriately Applied A 6-Level Enhancement For Substantial Financial Hardship

Defendant also has objected to a 6-level enhancement for engaging in an offense that resulted in a substantial financial hardship to 25 or more victims.    U.S.S.G. § 2B1.1(b)(2)(C)). In determining whether the offense resulted in "substantial financial hardship" to the victim, the court should consider, among other factors, whether the offense resulted in the victim:

- Suffering a substantial loss of a retirement, education, or other savings or investment fund; or

- Making substantial changes to his or her employment, such as postponing his or her retirement plans.

U.S.S.G. § 2B1.1(b)(2)(C)), App. Note 4(F).

At trial, the government called at least 26 victims, a small selection from the total number of victims impacted by the defendant's greed, as witnesses in this case.    While these victims did not testify at trial about the impact that Bank's illegal conduct had on their lives, almost every victim testified that the funds invested were, in fact, retirement funds saved over a lengthy period of time.    And almost every victim testified that they lost the entirety of their investment.    The Court sat through this five-week trial and saw dozens of victims testify about their dealings with Daryl Bank and his compatriots.    The vast majority of victims in this case suffered a substantial loss of retirement savings and, as a result, had to make substantial changes to their employment and indeed their lives generally, including the postponement or cancellation of retirement plans.

The government also presented evidence that this defendant targeted victims who were at or near retirement age for his scheme.    For example, at trial, the government admitted exhibit

105, which invited victims to a free dinner to hear a pitch about how to maximize their social security – one of several methods Bank and his conspirators used to identify potential victims with retirement assets they could target.   The government also admitted exhibit 1F, which included an advertisement aired on Bank's weekly radio show pitching financial planning services to "all retirees."   It was clear that Bank targeted individuals at or near retirement age – victims who could not afford to lose these funds – during his scheme to defraud.

The government will submit victim impact statements to the Court and defense counsel that demonstrate under the applicable preponderance standard that substantially more than 25 victims in this matter suffered a "substantial financial hardship" as a result of the scheme.   *See United States v. Amin*, 2021 WL 1041692, (4th Cir. March 18, 2021) (affirming district court's conclusion that business owners suffered a substantial financial hardship after they lost their savings and suffered "substantial changes to their employment" following the failure of the business).   The Court should overrule defendant's objection to this enhancement.   Far more than 25 victims will have to live with the devastating impact of Bank's illegal conduct for the rest of their lives.

### 3. The Government Agrees To Strike The Final Sentence of Paragraph 104, As It Is Not Necessary To Sustain A 2-Level Enhancement For Obstruction of Justice

Defendant included in his objections the final sentence of Paragraph 104, which dealt solely with Ms. Gibson's stolen hard drive.   As discussed below, the government does not object to striking the last sentence of paragraph 104, and instead will rely solely on Bank's false testimony as support for the properly applied obstruction enhancement.

Paragraph 104 of the Pre-Sentence Report outlined the numerous ways in which Bank testified falsely during the trial.   Defendant did not object to this part of the paragraph and, therefore, concedes that his perjury is sufficient to sustain the 2-level enhancement for obstruction of justice.   *See* U.S.S.G. 3C1.1, app. n 4(B) (noting that covered conduct includes "committing, suborning, or attempting to suborn perjury"); *see also United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (upholding district court's application of obstruction of justice enhancement and stating that "a defendant's right to testify does not include a right to commit perjury").   The government will continue to rely on the undisputed portion of this paragraph to sustain the 2-point obstruction enhancement.   As outlined in paragraph 104, Bank clearly lied about multiple, material matters in an attempt to obstruct justice, mislead the jury, and evade responsibility for his scheme to defraud.

The last sentence of paragraph 104 states: "He also attempted to obstruct justice when he stole a hard drive belonging to Gibson."   The government submits that, given the extensive perjury that Bank engaged in during this trial, it does not need another basis for the obstruction of justice enhancement, and that litigating that issue – which, telling as it is, pales next to the massive fraud Bank orchestrated over many years – is not an efficient use of the parties' or Court's time.   As such, the government agrees that the Court can strike the last sentence of paragraph 104 from the Pre-Sentence Report.

## IV.   18 U.S.C. ′ 3553(a) Factors

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide

just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, this Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

In light of these factors, a sentence of 35 years' imprisonment for Bank's convictions is reasonable and appropriate.

### A.    Nature and Circumstances of the Offenses

It would be hard to overstate the seriousness of defendant's crimes. He stole *tens of millions* of dollars from investors, most of them elderly. He robbed innocent people of their money, their retirements, their plans for their families and for the last decades of their life, and their trust. He did so out of an insatiable greed and a love for expensive luxuries he could not afford by honest work. The defendant, an experienced financial professional who knew the rules of the securities markets, exploited the trust his clients placed in him to steal their hard-earned money. He built a team of salesmen who helped him expand the reach of his fraud across the entire country. He and his salesmen pitched junk investment after junk investment and knowingly lied about their potential for growth—claiming, just to name a single example,

that the near-worthless spectrum investments they were selling were "among the most coveted Spectrum to wireless carriers," and that investors could "achieve a 100% annual preferred return on invested capital plus 50% of additional profits" on the investments.   Gov. Ex. 404.   Those were lies, plain and simple.

Had investors known the truth about any of the investments on offer – and the truth of what would happen to their money after they signed on the dotted line – none of them would have gone through with the transactions.   They invested because Bank and the salesmen he used lied about the investments.   Dental Support Plus Franchise (DSPF) Group, the investment pool Bank set up to buy out disgruntled investors in the DSPF investment, is a good example of the mendacity at the heart of this case.   Bank and his team lured unsuspecting investors into pooling their money to buy out investors unhappy with the lack of returns on their earlier dental investments.   Of course, none of that was disclosed to the new investors, who were of course not told that a substantial portion of their money would simply be stolen right off the top, and that the rest would go to buy out earlier investments in a business that everyone involved knew was failing.

The spectrum investments, like the DSPF and DSPF Group investments, and nearly everything Bank touched, were in the end total failures.   But this case is not just about a fraudulent investment scheme, improper due diligence, or misleading marketing materials.   Nor is it about standard market risk – investments with potential that simply did not pan out.   Here, the purported investment "opportunities" were just the hooks for Bank's larger theft scheme.   It did not matter what the claimed opportunity was – worthless dental "franchises," nearly worthless spectrum licenses, a failed home monitoring company, a failed locator bracelet, or a

11

failed trailer park.   Those opportunities, which Bank and his team successfully pitched by lying about them, were the means he used to funnel investor funds into bank accounts he controlled.

Nowhere did Bank disclose that he would have complete and total control over investors' funds.   And as though that conduct were not bad enough, Bank then simply looted the money that credulous investors put into his companies, immediately siphoning off between 20%–70% of investors' funds to other corporate entities he controlled.   He lied to get investors' money, and then he played a shell game with it – a game that funneled millions of dollars of victim funds into his personal American Express account, where he used them to pay for necessities like hundreds of high-end cufflinks, a $25,000 dog, luxury watches that cost more than many Americans make in a year, and a nearly $60,000 five-carat diamond for his wife.   It was never enough.

Because Bank elected to proceed to trial, the Court has heard witness after witness describe the scheme.   It also has heard Bank testify for more than a day in defense of it, lying repeatedly as he attempted to shift blame for his actions to others.   Given the Court's comprehensive view of the evidence, and the fulsome recounting of the scheme in the Pre-Sentence Report, at ¶¶ 15–105, the government will not rehash the facts in detail here. Suffice to say that the breadth of the fraud, and the length of time Bank continued it, switching investment "products" whenever necessary, was extraordinary.   The losses, and their impact on the victims in this case, are equally extraordinary.

The Court has numerous impact statements submitted by Bank's victims.   They are the people who are left to live the consequences of Bank's crimes, and their stories of the effect this fraud had on their lives is heartbreaking.   The impact statements give the clearest portrait of the

extraordinarily serious nature and circumstances of Bank's crimes.    Because of the scale of his theft, its effects on the victims will continue for the rest of their lives.

To give one example, the Court heard at trial from Michelle Bunn, who testified about Bank steering her and her husband Donald to invest in DSPF and then spectrum while he knew that Donald had cancer.    As Ms. Bunn recounts in her impact statement, her husband spent the last years of his life distraught over that decision, because his "biggest fear was if something happened to him would there be enough money for me to live on."    When the bottom fell out, they cried together many nights, and Donald, who died in 2019, blamed himself for what happened.    The Bunns' story is similar, in that respect, to that of many other victims who blame themselves.    The defendant took money from anyone he could get to invest in his schemes, but he took a particularly large amount of money from people who were not wealthy and who were at or near retirement.    Some had to push off retirement.    Others returned to work. Collectively, their visions of how they would live were dramatically altered.    Daryl Bank, for his part, took the money they needed for day-to-day expenses and used it to buy Cartier jewelry and $30,000 watches.

Another victim the Court will remember is Adan Rangel.    Mr. Rangel, who was 73 when he testified, spent his post-Army career at Montgomery Ward and at the American Automobile Association.    When his wife passed away, he looked to Bank's salesman, Roger Hudspeth, and then Bank himself to help him invest her estate.    He was initially put into DSPF – which ultimately failed – and then Bank spoke to him about spectrum and weMonitor, first on the phone and then in person at a restaurant.    Daryl Bank did not tell Adan Rangel, who was already retired, that he would control the companies he was asking Mr. Rangel to invest in.    He

did not tell him he would be moving substantial portions of Mr. Rangel's retirement money into other accounts he controlled, and then using it to fund his personal expenses.   Bank saw Mr. Rangel, as he saw other victims in this case, as an easy mark.   At the moment he sat across the table from Mr. Rangel to convince him to invest in these companies, he knew *exactly* what he was going to do with Mr. Rangel's money, and precisely how he would steal it.   His crimes were many things, but it is their arrogance and callousness that stand out.

The victims in this case are more than numbers on a spreadsheet.   They are real people, with real lives, who have been left to attempt to fix the devastation Bank caused.   His actions are reprehensible, and he should be in prison for a substantial amount of time.   A sentence of 35 years will adequately account for the defendant's lead role in this massive fraud.

### B.    Defendant's History and Characteristics

The defendant was raised in Norfolk by his mother, father, and step-father.   PSR ¶ 134. He graduated from Indian River High School, attended Tidewater Community College, and graduated from Old Dominion University in 1993.   He went on to receive a Master's Degree from Regent University in 1996.   PSR ¶¶ 143-146.   The defendant is in good physical health and has no substance abuse problems, though he has reported several mental health matters that appear to be at least partly under-substantiated.   PSR ¶¶ 140–141.

The defendant has worked in the financial industry since 1996, when he was briefly associated with Dean Witter.   Gov. Ex. 1M.   He then worked for UBS, Capital Securities Management, and BI Investments, before founding his own investment advisory operation.   *Id.* During his time in the industry, Bank took and passed a number of key licensing exams, including the Series 7, which required him to master the standards of care required by the

14

securities industry and allowed him to become a registered representative – *i.e.*, someone allowed to buy and sell securities for clients through a broker/dealer.   *Id.*   In 2009, FINRA filed a disciplinary proceeding against him, alleging he took part in a fraudulent kickback scheme.   In 2010, Bank agreed to be barred from the securities industry and consented to the entry of findings against him to resolve the FINRA investigation.   *See* Gov. Ex. 1A.   It was after that point – when Bank was no longer allowed to buy and sell securities for clients through a legitimate broker/dealer – that he launched the scheme at issue here.

Bank has no prior criminal convictions.   He was charged with assaulting an elderly process server in Florida with a gun, but was acquitted after testifying at trial.   PSR ¶ 133. While this is the defendant's first criminal conviction, it relates to an ongoing scheme of daily lawbreaking that ran for years – from 2011 until he was arrested in this case.   It is often said that a given defendant stopped committing crimes only because he was arrested.   That is eminently true here: nothing, including state regulatory lawsuits, action by the Securities and Exchange Commission, and an ongoing FBI investigation, stopped the defendant.   When Virginia authorities moved to shut down his illegal operation, he moved it to Florida.   When the SEC moved to shut down his blatantly illegal securities fraud operation by filing a federal lawsuit in Arizona, he changed the structure of his scheme to try to once again avoid government oversight.   Government Exhibit 2018, depicted below, is a timeline of the extraordinary series of regulatory and legal interventions in Bank's schemes lined up against the timeline of each fraudulent investment vehicle.   As clearly depicted there, there was not a single thing that any regulatory agency, criminal investigation, or failed product could do other than temporarily slow him down while he created a new fraudulent investment. It took the jury in this case to finally

15

put a stop to the defendant's dizzying array of investment frauds.



The defendant will undoubtedly argue that his lack of a criminal history should weigh in his favor at sentencing.   To the extent that argument is relevant in a case like this one, the government notes that it is not seeking a guidelines sentence.   But by and large the government disagrees with the contention.   Bank had personal advantages rarely seen in criminal defendants who appear before this Court.   He is well-educated and intelligent, having passed multiple intensive industry examinations on his first attempt, trained at reputable financial firms, and worked for years as a licensed and registered finance professional.   He is a convincing salesman, and he has certainly been industrious in his career.   Unfortunately, after he was banned by FINRA, he turned that industriousness to ever more sophisticated fraud schemes.   He

committed crime on essentially a daily basis beginning in late 2011, and nothing deterred him. He used his personal history and characteristics, and the skills and talents he acquired along the way, to gain the trust of innocent investors and help others do the same – and then exploited those victims, and helped others do the same.    Bank's personal history and characteristics support the requested sentence.

### C.    Need to Deter Future Criminal Conduct and to Protect the Public

Given the defendant's lack of remorse and single-mindedness during his execution of this scheme, which continued right down through his testimony at trial, specific deterrence and the need to protect the public weigh heavily here.    As the Court and the jury were able to observe, the defendant lied smoothly and well for hours on end as he tried to convince the jury he had done nothing wrong.    It was evident that he thought he could hoodwink them in the same way he hoodwinked so many people in this case.    He has not expressed an iota of regret for what he did, or the smallest understanding of the effect his actions had on the real lives of the victims. At every turn, Bank was able to dodge regulators and defraud additional victims with new twists on the same schemes.    His credit card statements, which are in evidence, speak volumes about the greed that drove him.    If given the opportunity, is there any doubt Bank would continue to defraud?    As he said himself, he knew enough other "hustles."    The hustles he ran here, thanks to his ability to use an army of salesmen, the internet, and the radio, spanned the country.    In cases like this, the need for specific deterrence and the protection of the public is at its apex.

The need for general deterrence also favors a significant sentence.    Bank abused his expertise and experience in the finance industry, and used his professional qualifications to further his scheme.    He illegally created, marketed, and sold his own securities, into companies

17

he controlled, and then stole investor funds.   The fraud was sophisticated and wide-ranging, and proving it required a complex and lengthy trial.   Securities fraud cases are relatively rare – out of tens of thousands of federal criminal cases brought each year, only a few hundred typically relate to securities and investment fraud.   And because fraud at Bank's scale is unusual, cases like his are closely watched in the financial services industry.   The sentence requested here would send a clear message to the finance community, whose members are entrusted with the hard-earned retirement money of their clients, that securities fraud and theft are extraordinarily serious crimes that will be met with serious consequences, regardless of the pedigree or professional accomplishments of the wrongdoer.

### D. Need to Avoid Unwarranted Sentencing Disparities

Among the defendants convicted in this case and in its related cases, *United States v. Maerki*, No. 2:19-cr-47, and *United States v. Hudspeth*, No. 2:17-cr-122, Bank is by a significant degree the most culpable.   For that reason, the sentence requested by the government will not lead to an unwarranted disparity.

The first defendant who accepted responsibility for his role was Roger Hudspeth. Hudspeth was a financial advisor involved in this scheme with Bank and Raeann Gibson. Hudspeth sold the fraudulent investments directly to the victims and personally pocketed $737,183 in ill-gotten gains.   On May 21, 2018, the Honorable Robert G. Doumar sentenced him to 151 months' imprisonment for his role.   *See United States v. Roger Odell Hudspeth*, 2:17-cr-122, ECF No. 38.

Next, Bank's right-hand woman, Raeann Gibson, also accepted responsibility and pleaded guilty to two counts of conspiracy in this matter.   Gibson was in charge of the

day-to-day operations of Bank's companies.    She frequently interacted with victims, lied to

them about the status of their investments, and helped launder the millions of dollars stolen from

them.    As was clear from her testimony, though, she acted on Bank's direction.    She did not

originate the scheme or reap most of its benefits – rather, she helped Bank carry it out.    On July

1, 2020, the Court sentenced Gibson to 120 months' imprisonment – the statutory maximum

under the plea agreement – and ordered her to pay $25,608,156 in restitution.    ECF No. 292.

Gibson expressed sincere remorse for the damage she inflicted on the victims, including during

her trial testimony.

Kent Maerki, 78 years old and the initial mastermind behind several of the fraudulent

investments, also pleaded guilty to conspiracy to commit mail and wire fraud.    In contrast to

Daryl Bank, Maerki actually accepted responsibility for his role in the fraudulent scheme.

Maerki, with assistance from others, created the Dental Support Plus Franchise investment and

initially introduced Bank and others to the spectrum investments.    He was sentenced to 192

months' imprisonment and ordered to pay over $23,000,000 in restitution.    *See United States v.*

*Kent Maerki et al.*, 2:19-cr-47, ECF No. 165.

Hudspeth, Gibson, and Maerki all accepted responsibility for their respective roles in this

matter.    The government entered into appropriate plea agreements that limited their sentencing

exposure in large part because they acknowledged the harm done to the victims.    The defendant

exercised his right to trial, and the government is not penalizing him for doing so.    But the

comparator sentences in this case and its related cases were handed down to conspirators who

accepted responsibility for their roles in the scheme, and the sentences they received reflect that.

Bank elected not to do so.    He chose to testify in his case, and lied repeatedly on the stand as he

attempted to blame everyone involved but himself for his crimes.   While Bank used several fraudulent investments originated by Kent Maerki and others as the vehicles for his own scheme, he took the fraud farther than anyone else involved, creating his own illegal securities, soliciting investments directly into companies he controlled, and then funneling investor funds to his co-conspirators and to himself to support his lavish lifestyle, to the tune of tens of millions of dollars in investor losses.   Bank was at the top of the pyramid – in two senses, since parts of the schemes here resembled more complex versions of classic Ponzi pyramids – and he reaped the concomitant rewards.   The same should be true at sentencing.

This case bears some similarities to several other investment fraud cases prosecuted in this District.   In *United States v. Titus*, No. 2:08-cr-154, the defendant was found guilty after a lengthy trial of conspiracy to commit mail and wire fraud, wire fraud, money laundering, and engaging in unlawful monetary transactions.   ECF No. 235.   The Court sentenced the defendant, whose schemes also targeted many victims' retirement savings, to 30 years in prison. *Id.*   The loss amount in that case, while in the millions of dollars, was significantly less than the loss amount here.

In another similar case, *United States v. Merrill Robertson, Jr.*, No. 3:16-cr-133, the defendant was convicted at trial of running a fraudulent investment and bank loan scheme. Robertson ran an investment company, Cavalier Union Investments, through which he pursued investments from individuals' retirement accounts.   He received almost $10 million from approximately 60 investors, using a scheme that like several at issue here involved fraudulent promissory notes, and then skimmed from and otherwise squandered the money.   *See United States v. Robertson*, No. 20-4028, 2021 WL 1384600 (4th Cir. Apr. 13, 2021) (per curiam).

20

The Court varied upward from a guideline range of 235-293 months and sentenced the defendant to 40 years in prison.   ECF No. 383.   That sentence was affirmed on appeal.   *Robertson*, 2021 WL 1384600.

Here, the loss amount was significantly greater, and the scheme was wider-ranging and much more successful.   Comparator cases in this District, and the sentences of co-conspirators in this and related cases, all support the government's requested sentence.   The defendant abused the securities market and the trust of dozens of vulnerable victims, many of whom the Court heard from at trial.   What the jury did not hear was the effect of the defendant's fraud on their lives.   The particulars of the devastation he caused, unique to each victim, are captured in the many impact statements submitted in this case, which tell the story of his crimes as well or better than any sentencing submission by the government could.   The defendant has not shown the slightest remorse for what he did.   His many crimes merit the significant punishment requested here.

**V.      Conclusion**

For the reasons stated above, the government asks the Court to impose a sentence of imprisonment of 35 years, a substantial term of supervised release, forfeiture, and full restitution to his victims.

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By:      _____/s/_____
Melissa E. O'Boyle
VA Bar No. 47449
Elizabeth M. Yusi
VA Bar No. 91982
Andrew C. Bosse
Assistant United States Attorneys

Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number:   757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address:   melissa.oboyle@usdoj.gov
                   elizabeth.yusi@usdoj.gov
                   andrew.bosse@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of September, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

I FURTHER CERTIFY that on this 13th day of September, 2021, I caused a true and correct copy of the foregoing Position of the Government with Respect to Sentencing Factors to be e-mailed to the following:

Jeffrey A. Noll<br>
Senior U.S. Probation Officer

_____/s/_____

Andrew Bosse
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number:   757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address:   andrew.bosse@usdoj.gov

23