IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

**DARYL BANK,**

    **Petitioner,**

v.                                            **CRIMINAL ACTION NO. 2:17-cr-126(1)**

**UNITED STATES OF AMERICA,**

    **Respondent.**

*MEMORANDUM OPINION AND ORDER*

Before the Court is Daryl G. Bank's ("Petitioner") *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 ("§ 2255 Petition"). ECF No. 541 ("Pet'r's Mot."). Petitioner filed a Memorandum in Support of the Motion. ECF No. 543 ("Pet'r's Mem."). Petitioner also filed a Supplemental Pleading in Support of the Motion. ECF No. 553 ("Pet'r's Suppl."). The Government opposed the Motion. ECF No. 560 ("Resp. Opp."). Petitioner filed a reply. ECF No. 573 ("Pet'r's Reply"). The Court held a hearing on this Motion. ECF No. 578 ("Transcript"). Petitioner later filed a Motion to Conduct a Supplemental Hearing or to Submit Expert Affidavit through court-appointed counsel. ECF No. 577. This matter is now ripe for judicial determination. For the reasons stated below, Petitioner's § 2255 Motion and Motion to Conduct a Supplemental Hearing are **DENIED**.

## I. FACTUAL AND PROCEDURAL HISTORY

On November 3, 2017, Attorney Jason M. Wandner appeared in this case as counsel for Petitioner. ECF Nos. 26, 27. On December 14, 2017, Attorney James Orlando Broccoletti appeared in this case as counsel for Petitioner. ECF No. 34. On May 3, 2018, Attorney Wandner withdrew as counsel for Petitioner. ECF No. 87. On May 25, 2018, Petitioner was named in a Second

1

Superseding Indictment charging him with the following twenty-eight Counts:

- Count One: Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349;

- Counts Two through Six: Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 2;

- Counts Seven through Twelve: Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2;

- Count Thirteen: Conspiracy to Sell Unregistered Securities and to Commit Securities Fraud, in violation of 18 U.S.C. § 371;

- Counts Fourteen through Eighteen: Sale of Unregistered Securities, in violation of 15 U.S.C. §§ 77e, 77x, and 18 U.S.C. § 2;

- Counts Nineteen through Twenty-two: Securities Fraud, in violation of 15 U.S.C. §§ 77q, 77x, and 18 U.S.C. § 2;

- Counts Twenty-three: Conspiracy to Launder Money Instruments, in violation of 18 U.S.C. § 1956(h);

- Counts Twenty-four through Twenty-eight: Unlawful Monetary Transactions, in violation of 18 U.S.C. §§ 1957 and 2.

ECF No. 105.

On June 6, 2018, Petitioner appeared before the Magistrate Judge for his arraignment. ECF No. 114. On March 29, 2021, the Court dismissed Count Eight. ECF No. 352. On March 30, 2021, a five-week jury trial commenced. ECF Nos. 359–93. At trial, the Government proved that Petitioner owned Dominion Private Client Group, LLC ("DPCG") and he directed others to sell fraudulent "private equity" investment opportunities. Present. Investig. Rep., ECF No. 442 ¶¶ 18–21 ("PSR"). Petitioner established numerous limited liability companies that he controlled, through which he offered investment opportunities to potential investors. *Id.* Petitioner and other

2

conspirators made material misrepresentations "to potential investors about these investments during sales pitches, live presentations, radio shows, social security maximization seminars, and other communications." *Id.* ¶ 25. Petitioner did not invest his own money in any of the limited liability companies; instead, he almost exclusively relied on investor funds. *Id.* ¶ 28. Petitioner and other co-conspirators directed investors to withdraw funds from various accounts, including 401(k) and other retirement accounts, "and transfer the funds to self-directed Individual Retirement Accounts at trust companies." *Id.* ¶ 29. Petitioner stole $25,608,156.83 from hundreds of victims of his scheme. *Id.* ¶ 107.

On April 30, 2021, the jury found Petitioner guilty of all Counts. ECF No. 394. On September 20, 2021, the Court sentenced Petitioner to 420 months, followed by 3 years of supervised release. ECF No. 472. Two days later, Petitioner filed a notice of appeal. ECF No. 474. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") affirmed Petitioner's convictions. ECF No. 534. Petitioner did not file a petition for a writ of certiorari with the United States Supreme Court within 90 days from the date the Fourth Circuit entered its mandate, which was on June 28, 2023.

On September 24, 2024, Petitioner filed the instant Motion before the Court. On September 27, 2024, Petitioner filed a Memorandum in Support of the Motion. On November 25, 2024, Petitioner filed a Supplemental Pleading. On February 28, 2025, the Government filed a Response in Opposition. On May 15, 2025, the Court appointed Attorney Fernando Groene to represent Petitioner in his § 2255 proceedings. On May 21, 2025, Petitioner filed a Reply. On July 9, 2025, the Court held a hearing on this Motion. On July 22, 2025, Petitioner filed a Motion to Conduct a Supplemental Hearing or to Submit Expert Affidavit through court-appointed counsel, Attorney Groene.

3

## II. LEGAL STANDARD

### A. Section 2255

Section 2255 allows a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . [to] move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255. In a § 2255 motion, the petitioner bears the burden of proving his or her claim by a preponderance of the evidence. *See Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958). Additionally, *pro se* filers are entitled to more liberal construction of their pleadings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

When deciding a § 2255 motion, the Court must promptly grant a hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Motions under § 2255 generally "will not be allowed to do service for an appeal." *Sunal v. Large*, 332 U.S. 174, 178–79 (1947). For this reason, issues already fully litigated on direct appeal may not be raised again under the guise of a collateral attack. *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013). Issues that should have been raised on direct appeal are deemed waived, procedurally defaulted, and cannot be raised on a § 2255 motion. *United States v. Mikalajunas*, 186 F.3d 490, 492 (4th Cir. 1999).

However, an individual may raise a procedurally defaulted claim if he or she can show (1) "cause and actual prejudice resulting from the errors of which he complains" or (2) that "a miscarriage of justice would result from the refusal of the court to entertain the collateral attack . . . [meaning] the movant must show actual innocence by clear and convincing evidence." *Id.* at 492–93. To demonstrate cause and prejudice, a petitioner must show the errors "worked to [his or her] actual and substantial disadvantage, infecting [his or her] entire trial with error of

4

constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Ineffective assistance of counsel claims should generally be raised in a collateral motion instead of on direct appeal and constitute sufficient cause to review a procedurally defaulted claim. *See Untied States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008); *Mikalajunas*, 186 F.3d at 493.

### B. Ineffective Assistance of Counsel Claim

A viable ineffective assistance of counsel claim arises when "the counsel's conduct so undermined the proper functioning of the adversarial process that the trial did not result in a just outcome." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). An ineffective assistance of counsel claim is properly raised on a § 2255 motion in the district court rather than on direct appeal, unless the record conclusively shows ineffective assistance. *United States v. Williams*, 977 F.2d 866, 871 (4th Cir. 1992). To prove a claim of ineffective assistance of counsel, a petitioner must make two showings.[1]

First, a petitioner must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. Counsel's errors must have been so serious that he or she was not actually functioning as "counsel" as guaranteed by the Sixth Amendment. *Id.* To demonstrate deficient performance, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness" under the prevailing norms of the legal community. *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential," so "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. That presumption is even greater when counsel's decisions represent strategic tactical decisions requiring "assessment and balancing of perceived benefits against

---

[1] For claims based on attorney conflicts, the Petitioner must show: 1) an actual conflict of interest; 2) the actual conflict of interest adversely affected his lawyer's performance. *See Cuyler v. Sullivan*, 446 U.S. 335 (1980).

5

perceived risks." *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004). A petitioner bears the burden of rebutting this presumption. *Strickland*, 466 U.S. at 689.

Second, a petitioner must show that the deficient performance prejudiced the defense. *Id.* at 687. In other words, counsel's errors must have been so serious that the petitioner was deprived of a fair trial with a reliable result. *Id.* To demonstrate prejudice, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines a reasonable probability as "a probability sufficient to undermine confidence in the outcome." *Id.* In short, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgement of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. If a petitioner cannot meet either component of the *Strickland* test, the ineffective-assistance claim will fail. *Id.* at 700. The Court need not address both components of the test if petitioner makes an insufficient showing on one prong. *Id.* at 697.

### III. DISCUSSION

Petitioner moves the Court to vacate his conviction based on four grounds: (1) Petitioner's counsel, Attorney Broccoletti, was ineffective because of an alleged conflict of interest that the Government threatened to expose, resulting in the possible disqualification of Attorney Broccoletti, unless Petitioner agreed to turn over the hard drive; (2) Attorney Broccoletti made false allegations against former defense counsel, Attorney Wandner, which induced Petitioner to fire Attorney Wandner as counsel; (3) Attorney Broccoletti failed to call certain defense witnesses; and (4) Attorney Broccoletti failed to present evidence regarding the structure of his company, which would have aided in his theory of defense. *See* Pet'r's Mot.; Pet'r's Mem.; Pet'r's Suppl. All of Petitioner's claims are premised on ineffective assistance of counsel, except for the first

6

claim, which concerns attorney conflicts. Accordingly, the Court will analyze each claim separately.

Petitioner also filed a Motion to Conduct a Supplemental Hearing or Submit Expert Affidavit, which the Court will address separately.

### A. Petitioner's Arguments

### Ground One: Ineffective assistance of counsel—Alleged conflict of interest

First, Petitioner asserts that Attorney Broccoletti rendered ineffective assistance of counsel because of an alleged conflict of interest. Pet'r's Mot. at 4; Pet'r's Mem. at 15–16. According to Petitioner, the Government threatened to expose this purported conflict, potentially resulting in the disqualification of Attorney Broccoletti unless Petitioner agreed to turn over the hard drive. *Id.*

The basis of this alleged conflict stems from Raeann Gibson, Petitioner's former employee and co-defendant, residing with Attorney Broccoletti's paralegal, Kate O'Brien, who was working on Petitioner's case. Pet'r's Mem. at 16. At some point, Ms. Gibson agreed to plead guilty, and Ms. O'Brien packed Ms. Gibson's belongings and brought them to Attorney Broccoletti's office. *Id.* at 4–5. Petitioner claims he saw Ms. Gibson's belongings at Attorney Broccoletti's office and saw his hard drive in her belongings. *Id.* He immediately took possession of the hard drive, and upon reviewing its contents, discovered that Ms. Gibson allegedly tried to download files onto the drive related to his case. *Id.*

Petitioner contends that once the Government learned about the living arrangements between Ms. Gibson and Ms. O'Brien, the Government threatened Attorney Broccoletti to turn over the hard drive, and, if not, Attorney Broccoletti could be removed from the case because of a conflict of interest, leaving Petitioner to find another counsel. *Id.* at 16. Allegedly, the Government's threat impacted Attorney Broccoletti's decisions in this case. *Id.* During the trial,

7

the Government also precluded Ms. O'Brien from being present inside the courtroom, as she was now a potential Government witness. *Id.*

The Government argues that there was an ethical issue because there was evidence of a crime on the hard drive that was within Attorney Broccoletti's control. Resp. Opp. at 15. Petitioner agreed to turn over the hard drive and was aware of the attorney-client filter review process to "ensure the sanctity of his attorney-client relationship." *Id.* As such, Attorney Broccoletti's performance was not deficient, and the hard drive's production did not prejudice Petitioner in any way. *Id.*

However, in Attorney Broccoletti's affidavit, he stated there was a dispute regarding the ownership of the hard drive—whether it belonged to Petitioner or Ms. Gibson. *Id.* at 25. Regardless, Petitioner removed the hard drive from Ms. Gibson's belongings, which "sent the case off in a difficult trajectory." *Id.* Although Attorney Broccoletti attempted to prove Petitioner's ownership of the hard drive through purchase receipts, he was unsuccessful. *Id.* Attorney Broccoletti sought clarity of the contents on the hard drive and the Government's persistent interest in the drive, eventually learning it contained attorney-client communications and potentially evidence of a crime. *Id.* Petitioner was aware of these issues and, with his consent, a taint review was conducted to screen out privileged material. *Id.* at 26. According to Attorney Broccoletti, "the hard drive was insignificant as very little of anything of value was produced, and what was of value was used by the defense and would have had to be produced through reciprocal discovery in any event." *Id.*

At the evidentiary hearing, Petitioner testified that he and Ms. Gibson worked in a "war room" at Attorney Broccoletti's office to prepare for trial. Transcript at 18:15–25; 19:1–4. After Ms. Gibson accepted the plea offer, her belongings were taken to Attorney Broccoletti's office. *Id.*

8

at 20:17–25. 21:1–2. Petitioner denied searching through her belongings, but later claimed he found the drive in what he believed was Ms. O'Brien's office. *Id.* at 21:10–12, 23–25. The hard drive had various documents that Petitioner allegedly put together for trial. *Id.* Petitioner also acknowledged Ms. Gibson had personal papers and legal correspondence from her attorney on the drive. *Id.* at 28:14–21. Although Petitioner claimed some of the documents were introduced at trial, he later testified on cross-examination that he could not recall any exhibits derived from the drive that the Government used at trial that prejudiced him. *Id.* at 42:14–16, 64:14–24. He also claims that Attorney Broccoletti instructed him to tell the Court that he took possession of the hard drive, which he did not do until after Attorney Broccoletti's staff finished making a copy. *Id.* at 67–68.

Ms. O'Brien testified that even though she worked with Petitioner, she also worked with Ms. Gibson, who was represented by different counsel. *Id.* at 91:1–6. With Attorney Broccoletti's approval, Ms. Gibson resided with Ms. O'Brien while they prepared for trial. *Id.* at 93:16–25, 94:1–10. While preparing for trial, they both had access to trial materials. *Id.* at 96:4–6. Later, Ms. O'Brien learned that Ms. Gibson accepted the Government's plea offer and had her roommate bring Ms. Gibson's belongings to Attorney Broccoletti's office. *Id.* at 97–98. While Ms. Gibson's belongings were in the office, Ms. O'Brien and Petitioner removed the hard drive from the basket because Petitioner claimed ownership over the hard drive. *Id.* at 99–100. Eventually, the Government pressured the defense to relinquish the hard drive, and Ms. O'Brien became concerned that she could potentially face criminal charges. *Id.* at 105:2–14. Additionally, Ms. O'Brien learned that Attorney Broccoletti could be removed from the case. *Id.* As such, Ms. O'Brien recommended to Petitioner that he should turn over the hard drive to the Government. *Id.* Moreover, Ms. O'Brien confirmed that while present in the courtroom, she did not observe any

9

attorney-client work product introduced into evidence. *Id.* at 124:22–25, 125:1–2.

Attorney Broccoletti testified that Petitioner took the hard drive from Ms. Gibson's belongings. *Id.* at 135:4–18. Petitioner disclosed to Attorney Broccoletti that there was privileged material on the drive, which concerned Attorney Broccoletti. *Id.* at 137:3–9. An agreement was reached with the Government to conduct a taint review, and the Government did not use any of the documents removed from the drive at trial. *Id.* at 138:10–16, 139:11–16. Additionally, Attorney Broccoletti stated that he was not concerned with being conflicted out of the case. *Id.* at 142:2–3. On cross-examination, Attorney Broccoletti stated that he does not recall Ms. O'Brien expressing that she felt threatened for not complying with the Government's demand for the hard drive; however, he had the impression that she had personal animosity towards Ms. Gibson. *Id.* at 159:7–16. He also confirmed the Government subpoenaed Ms. O'Brien to testify about the hard drive. *Id.* at 161:21–23.

"Defense counsel [has] an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." *Sullivan*, 446 U.S. at 346. "[A] defendant . . . must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348. "A significant conflict of interest arises when an attorney's interest in avoiding damage to [his] own reputation is at odds with his client's strongest argument—*i.e.*, that his attorneys had abandoned him." *United States v. Glover*, 8 F.4th 239, 247 (4th Cir. 2021) (internal quotations and citation removed).

"To find an actual conflict, [courts] require [a] petitioner to 'point to specific instances in the record to suggest an actual conflict or impairment of [his] interests' and 'demonstrate that the attorney made a choice between possible alternative courses of action . . .'" *McElrath v. Simpson*, 595 F.3d 624, 631 (6th Cir. 2010).

"To establish an adverse effect, a § 2255 petitioner must satisfy, by a preponderance of the evidence, a three-part standard." *United States v. Nicholson*, 475 F.3d 241, 251 (4th Cir. 2007). First, Petitioner must "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued." *Id.* at 252 (internal quotations and citation removed). Second, Petitioner must show "the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision." *Id.* The tactic or alternative strategy must be "clearly suggested by the circumstances." *Id.* Lastly, Petitioner must show "the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Id.* "[P]etitioner is not required to show that the strategy or tactic not taken would have been successful, but only that it would have been objectively reasonable." *Id.* "Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Sullivan*, 446 U.S. at 349–50.

Here, the Court finds that Petitioner has not demonstrated the existence of an actual conflict. While it was not in Attorney Broccoletti's best interests to agree to allow Ms. Gibson to reside with Ms. O'Brien, Petitioner cannot point to specific instances in the record nor demonstrate alternative courses of action as it relates to the hard drive. In fact, the record and testimonies reflect that Petitioner took the hard drive from Ms. Gibson's belongings, reviewed its contents, and asserted ownership over a hard drive that likely was not his. Attorney Broccoletti had legitimate ethical concerns about attorney-client communications and evidence of a crime on the hard drive based on statements from Petitioner. There was no other alternative course of action Attorney Broccoletti could have pursued besides recommending to his client a taint review, which Petitioner agreed to. Moreover, the Government did not use any materials the taint review team excluded, and Petitioner cannot identify any privileged or confidential information introduced at trial because

11

of the alleged conflict.

Even assuming an actual conflict existed, Petitioner cannot show that it adversely affected Attorney Broccoletti's decisions. Again, Petitioner cannot "identify a plausible strategy or tactic that [Attorney Broccoletti] might have pursued." *Nicholson*, 475 F.3d at 252. In fact, Attorney Broccoletti undertook extensive efforts to establish ownership of the drive, shield privileged material, and avoid any prejudice to Petitioner. Attorney Broccoletti exhausted every potential course of action until the parties, including Petitioner, agreed to a taint review team screening out privileged documents. Since Petitioner cannot clear the first hurdle of the adverse effect inquiry, further analysis is unnecessary.

As stated on record and at the evidentiary hearing, the Government did not use any documents on the hard drive, and nothing on the hard drive benefited Petitioner's case. Regardless, any documents Petitioner planned to use at trial would have been subject to reciprocal discovery. As such, production of the hard drive did not affect Attorney Broccoletti's performance. Thus, Petitioner has not shown the existence of an actual conflict, nor has he shown that any conflict of interest contributed to deficiencies in Attorney Broccoletti's performance under *Strickland*. Accordingly, Petitioner's first claim is denied.

### Ground Two: Ineffective assistance of counsel—Attorney Broccoletti induced Petitioner to fire Attorney Wandner

Second, Petitioner claims Attorney Broccoletti rendered ineffective assistance of counsel because he made false allegations about former defense counsel, Attorney Jason Wandner, which induced Petitioner to terminate Attorney Wandner as counsel. Pet'r's Mot. at 5; Pet'r's Mem. at 17. Specifically, Petitioner asserts that Attorney Wandner was accused of being aggressive and making AUSA Melissa O'Boyle uncomfortable. Pet'r's Mem. at 8. Petitioner further alleges that

12

the Government threatened to stop cooperating with the defense unless he dismissed Attorney Wandner. *Id.* at 8, 17. Petitioner believes that, had Attorney Wandner stayed on the case, he would have pursued his theory of defense more aggressively and emphasized the structure of his business at trial. *Id.* at 17.

Additionally, Petitioner claims that he paid Attorney Wandner a $150,000 retainer fee, but received only $50,000 back at the conclusion of his services, despite the minimal work performed on his case. *Id.* at 8–9. He believes Attorney Broccoletti failed to provide the full return of the retainer. *Id.*

In response, the Government argues that Petitioner's claim is a factual dispute unsupported by corroborating evidence and insufficient to establish deficient performance under *Strickland*. Resp. Opp. at 16. The Government further contends that, even if the Court considered whether there was prejudice to Petitioner under *Strickland*, there was overwhelming evidence against Petitioner establishing his guilt. *Id.* On appeal, Petitioner, represented by new counsel, did not even allege "a sufficiency-of-the-evidence challenge to his counts of conviction." *Id.*

Attorney Broccoletti asserted in his affidavit that communication between Attorney Wandner and Petitioner became difficult because Petitioner was frustrated that Attorney Wandner would not travel to Virginia to visit him while in jail. *Id.* at 24. Petitioner also became dissatisfied with the lack of pleadings Attorney Wandner prepared and the perceived inadequacy of the filings. *Id.* In the spring of 2018, Attorney Broccoletti traveled to Florida to meet with Attorney Wandner and assist with the case. *Id.* Petitioner asked counsel if Attorney Wandner was necessary to the case. *Id.* Counsel informed Petitioner that the choice was his, and assured Petitioner he could handle this case on his own. *Id.* Petitioner then voluntarily terminated Attorney Wandner. *Id.* Petitioner then inquired about the fee he paid to Attorney Wandner, and Attorney Broccoletti

explained that it was a matter solely between Petitioner and Attorney Wandner. *Id.* at 24–25. Petitioner received a partial refund, while Attorney Wandner retained a substantial portion of the fee. *Id.*

At the evidentiary hearing, Petitioner testified that he terminated Attorney Wandner's representation via phone call and letter because he was frustrated with Attorney Wandner's failure to visit him while in custody in Virginia. Transcript at 15:9–17, 72:8–10, 72:15–25, 73:1–3. Other witnesses, including Ms. O'Brien and Attorney Broccoletti, corroborated that Petitioner signed the termination letter because of limited contact with Attorney Wandner during Petitioner's pretrial detention. *Id.* at 89, 117–18, 132–33, 152.

Here, the record does not support Petitioner's claim that Attorney Broccoletti misled him into terminating Attorney Wandner. Petitioner made the final decision to discharge Attorney Wandner and signed a letter of termination. That decision alone is insufficient to establish that Attorney Broccoletti's performance fell below an objective standard of reasonableness. Even assuming arguendo that Attorney Broccoletti's conduct was deficient, Petitioner fails to demonstrate resulting prejudice. He has not shown how the continued representation by Attorney Wandner would have altered the outcome of his case, particularly considering the substantial evidence of guilt presented at trial. Thus, Petitioner's second claim is denied.

### Ground Three: Ineffective assistance of counsel—Failed to call defense witnesses

Third, Petitioner claims that Attorney Broccoletti failed to call certain defense witnesses and an expert witness, who would have aided in his defense. Pet'r's Mot. at 6; Pet'r's Suppl. at 3. The Government argues that contrary to Petitioner's assertions, Attorney Broccoletti mounted a sound defense and called six witnesses who were willing to testify. Resp. Opp. at 17. However, Attorney Broccoletti asserts in his affidavit that the six witnesses who testified at trial were paid

out of his own pocket and spoke to the defense's theory of the case. *Id.* at 26. He further explained that the individuals he did not call were co-defendants represented by counsel, had pending charges, and refused to testify. *Id.* He emphasized that he called the witnesses who were willing to cooperate and appear. *Id.*

At the evidentiary hearing, Petitioner testified that the agreement he had with Attorney Broccoletti was a flat-fee agreement. Transcript at 36:15–25. As Petitioner was preparing for trial, he wanted Attorney Broccoletti to call an expert witness, Donald Moore, to testify about banks and trust companies, as he believed his business was exempt from the Securities Act of 1933. *Id.* at 45. According to Petitioner, although Attorney Broccoletti was aware of this request, he declined to call Mr. Moore, opting instead to keep the case simple since it was a very complex financial case. *Id.* at 47:19–25, 48:1–3.

Petitioner also wanted several witnesses, including Les Revzon and Kevin and George Brown, to testify about the structure of his company and the trust and compliance approval process regarding investments. *Id.* at 48–49. However, he stated he lacked the funds necessary to cover their travel expenses. *Id.* Petitioner admitted he did not know whether Attorney Broccoletti had contacted the Browns, but he was aware that Mr. Revzon had refused to testify. *Id.* at 52–53. On cross-examination, Petitioner admitted to reviewing the *Jencks* material the Government provided to the defense, which would have indicated the potential witnesses' testimonies. *Id.* at 73.

Ms. O'Brien confirmed during direct examination that Attorney Broccoletti was aware of Mr. Moore, but chose not to call him. *Id.* at 112:5–11. She also stated that the defense had access to *Jencks* material, which outlined the anticipated testimony of the other potential witnesses. *Id.* at 115:3–8.

Attorney Broccoletti testified that all his contracts are flat fee plus expenses, which means

his clients are responsible for paying for witness travel. *Id.* at 134:3–9. Any witnesses Petitioner wanted Attorney Broccoletti to call, he reviewed all the discovery and reports from the Government, which gave the defense team an idea regarding who to call, as some witnesses were uncooperative, would not add any substance to the case, or were represented by counsel. *Id.* at 142–43. On cross-examination, Attorney Broccoletti stated even if Mr. Revzon could be called, he indicated to the defense team that "he would be extraordinarily detrimental to [Petitioner's] defense." *Id.* at 165:14–25. He also does not recall Petitioner requesting him to call Mr. Moore as an expert witness. *Id.* at 167:16–19. The Government objected to the other witnesses Attorney Broccoletti wanted to propound as expert witnesses. *Id.* at 168–69. As a result, those witnesses testified as fact witnesses, although their testimony may have bordered on expert testimony. *Id.*

Many courts have found that witness selection will not be second guessed. *See, e.g., United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (finding "the decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which [w]e must afford . . . enormous deference.") (internal citations and quotations omitted) (alteration in original); *Hanes v. Dormire*, 240 F.3d 694, 698 (8th Cir. 2001) (holding "[d]ecisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guessed by hindsight.") (internal citation and quotations omitted); *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1434 (3d Cir. 1996) (holding "[s]everal courts have also recognized witness selection as being among the non-fundamental decisions that counsel is entitled to make at trial.").

Here, Attorney Broccoletti called six witnesses, including Petitioner, who testified regarding the various entities with which Petitioner was involved. Despite their testimony, the jury convicted Petitioner. Attorney Broccoletti's strategic witness selection was objectively reasonable,

and Petitioner cannot now challenge these trial decisions simply because he disagrees with the outcome at trial. Regardless of the dispute concerning Mr. Moore, the record reflects that Attorney Broccoletti made efforts to call witnesses with relevant knowledge, including those whom he unsuccessfully attempted to propound as experts. Accordingly, the Court does not find Attorney Broccoletti's performance deficient. Thus, Petitioner's third claim is denied.

### Ground Four: Ineffective assistance of counsel—Failed to present defense theory

Fourth, Petitioner asserts that Attorney Broccoletti rendered ineffective assistance of counsel because he failed to present evidence regarding the structure of his company, which he claims would have aided in his theory of defense. Pet'r's Mot. at 8; Pet'r's Suppl. at 3. Specifically, Petitioner contends that Attorney Broccoletti failed to introduce evidence regarding the structure of his company as a subsidiary of two controlling companies, Summit Trust Company and Revzon Consulting. Pet'r's Suppl. at 3. These companies had to approve every investment, and there were files detailing the nature of the investment. *Id.*

In response, the Government asserts that Attorney Broccoletti did, in fact, present Petitioner's theory of defense, including efforts to explain the structure of Petitioner's company and its investment approval process. Resp. Opp. at 18. Attorney Broccoletti called multiple witnesses, including Jennifer Revzon of Revzon Consulting, one of the companies that allegedly approved the investments, as well as Petitioner himself. *Id.* at 18–19. Petitioner testified for hours regarding the nature of his business, but the jury was unconvinced. *Id.*

Attorney Broccoletti, in his affidavit, stated that the trial record refutes Petitioner's claim. *Id.* at 27. He advised the jury of four "pieces of evidence: compliance, review, acceptance[,] and approval." *Id.* He also cross-examined the Government's witnesses about the documents they signed, which disclosed the risks associated with the investments. *Id.* at 27–28. He emphasized

that he presented a viable defense, but the Government's witnesses overshadowed his theory with descriptions of their financial hardship and ruin. *Id.* at 29.

At the evidentiary hearing, Petitioner testified that he was very involved in preparing his defense, including reviewing documents, strategizing with Attorney Broccoletti, and preparing exhibits for trial. Transcript at 59:21–25, 60:1–3. Petitioner further admitted that Attorney Broccoletti articulated the defense theory throughout the trial, including in his opening statement, cross-examinations, defense exhibits, and calling Petitioner to testify. *Id.* at 77–78.

During direct examination, Attorney Broccoletti testified that he incorporated Petitioner's defense theory into his cross-examinations. *Id.* at 147. He used the signed contracts to demonstrate that the victim witnesses were aware of the investment risks. *Id.* at 148. He also stated that Petitioner was among the most engaged clients he worked with, describing his involvement in the case "[a]s detailed, as concentrated, as intense as any person I've ever seen. It was his life." *Id.* Attorney Broccoletti stated that he and Petitioner had no disagreements about trial strategy and recalled Petitioner saying after closing arguments that Attorney Broccoletti had "flipped the switch on the [G]overnment and created a whole new theory that the [G]overnment had not presented." *Id.* at 148–49.

As the Supreme Court stated in *Strickland*, "scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

Here, the record sufficiently shows that Attorney Broccoletti's litigation strategy was sound. He employed various litigation techniques to advance Petitioner's theory of defense. These included presenting documentary evidence, cross-examining Government witnesses and victim

witnesses about the risks disclosed in the contracts they signed, and making opening and closing statements that framed the defense's narrative. Petitioner cannot now rely on unfavorable witness testimony or the outcome of the trial to second-guess his counsel's strategy. Accordingly, the Court finds that Attorney Broccoletti zealously advocated on Petitioner's behalf, and his performance was not deficient. Thus, Petitioner's fourth claim is denied.

### B. Motion to Conduct Supplemental Hearing or to Submit Expert Affidavit

Petitioner requests that the Court reopen the evidentiary hearing to allow him to call those named witnesses identified in his briefs, including Les Revzon, George and Kevin Brown, and Attorney Lynne Shelton. ECF No. 577 at 1. Petitioner challenges Attorney Broccoletti's testimony that these witnesses were either reluctant to appear or refused to testify. *Id.* Petitioner also seeks to call Donald Moore, the potential expert witness, to testify regarding his expertise in trust and securities, and to assert that he discussed his expertise with the defense team, but was never contacted thereafter. *Id.* at 2. In the alternative, if Mr. Moore is not permitted to testify, Petitioner wants to submit an affidavit from Mr. Moore to supplement the record. *Id.*

The Court finds that Petitioner's request is untimely. He had ample opportunity before the evidentiary hearing to call any witnesses that he thought would be necessary to advance the four issues he raised in his § 2255 Motion. He was on notice of the evidentiary hearing date two months in advance and cannot now, nearly two weeks after the hearing concluded, seek to reopen the proceedings in an effort to supplement the record.

A supplemental evidentiary hearing would simply be a waste of judicial resources, and the Court will not conduct another hearing as the record before it shows that Petitioner is not entitled to relief under § 2255. Therefore, Petitioner's Motion is denied.

## IV. CONCLUSION

For the reasons stated above, Petitioner's § 2255 Motion is **DENIED**. ECF No. 541. Additionally, Petitioner's Motion to Conduct a Supplemental Hearing is **DENIED**. ECF No. 577.

This Court may issue a certificate of appealability only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b)(1). This means that Petitioner must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)); *see United States v. Swaby*, 855 F.3d 233, 239 (4th Cir. 2017). Petitioner's claims are based upon incorrect interpretations of statutory provisions and judicial precedent. As such, Petitioner fails to demonstrate a substantial showing of a denial of a constitutional right, and a Certificate of Appealability is **DENIED**.

In addition, the Court **ADVISES** Petitioner that he may appeal from this Final Order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. The Clerk must receive this written notice within sixty (60) days from this Order's date. The Court **DIRECTS** the Clerk to provide a copy of this Order to all Parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
July 31, 2025

/s/
Raymond A. Jackson
United States District Judge

20